CITY OF FORT WORTH v. GULF REFINING COMPANY ET AL.

No. 5981.   Decided May 22, 1935.
Rehearing overruled July 3, 1935.
(83 S. W., 2d Series, 611.)

R. E. Rouer, J. M. Floyd, and R. B. Young, Jr., all of Fort Worth, for plaintiff in error.

The business of operating a drive-in filling station is of such

a nature as to render it subject to reasonable regulations under the police power. City of San Antonio v. Humble Oil and Ref. Co., 27 S. W. (2d) 868; City of San Antonio v. Robt. Thompson & Co., 23 S. W. (2d) 796; Scott v. Champion Bldg Co., 28 S. W. (2d) 178; City of Lubbock v. Magnolia Pet. Co., 6 S. W. (2d) 80.

A yearly fee of $24.00 charged under the terms of the ordinance is a license fee passed and adopted by the Board of Commissioners in the exercise of a fair discretion reposed in it under the provisions of a special act of the legislature termed a "Charter" and by the general laws and police power of the State for the protection of the public in their health, convenience, safety and general welfare, and is not an occupation tax. Hogston v. Bell, 185 Ind., 536, 112 N. E., 883; Missouri Pac. Ry. Co. v. Mackey, 127 U. S., 205, 8 Sup. Ct., 1161; Booth v. Dallas, 179 S. W., 301; Bradford v. City of Houston, 4 S. W. (2d) 592; Brown v. City of Galveston, 97 Texas, 1, 75 S. W.; 488.

*R. L. Batts,* of Austin, *John E. Green, Jr.,* and *David Proctor,* both of Houston, and *Peveril O. Settle* and *David W. Stephens,* both of Fort Worth, for defendant in error.

A municipality has no power or authority to levy a tax or impose a license on any person, except a public utility, for the use of a public street or any driveway from private property to such street or avenue. Mitchell v. Bass, 26 Texas, 372; Gulf Ref. Co. v. City of Dallas, 10 S. W. (2d) 151; St. Louis v. Western Union Tel. Co., 148 U. S., 92, 37 L. ed., 380.

*F. A. Williams,* of Galveston, *W. H. Francis, A. S. Hardwicke, Russel Surles, Walace Hawkins,* all of Dallas, *V. R. Tomlinson, Sloan Blair, Cantey, Hanger & McMahon, Alfred McKnight, Gillis A. Johnson,* all of Fort Worth, *R. F. Spencer* and *A. J. Lewis,* both of San Antonio, and *Roy T. Osborn,* of New York City, filed briefs and arguments as amici curiae.

MR. CHIEF JUSTICE CURETON delivered the opinion of the Court.

This case is before us by writ of error. It involves the validity of an ordinance of the plaintiff in error providing an annual charge of $24 for the right to operate each gasoline filling station in the city.

The trial court sustained the ordinance, and denied the injunction prayed for, but the Court of Civil Appeals held it void, reversed the trial court's judgment, and entered a decree

in favor of defendants in error. (36 S. W. (2d) 285). The case was first assigned to the Commission of Appeals, which, upon hearing, held the ordinance valid and recommended the reversal of the judgment of the Court of Civil Appeals and the affirmance of that of the trial court. A decree was entered in accordance with this recommendation. 55 S. W. (2d), pp. 792, 794.

On rehearing the Commission changed its views and held the ordinance void on the ground that it was "purely a revenue measure, having for its purpose the exaction of a tax on the business and occupation as such for revenue, and is therefore void." We then withdrew and heard the case.

After careful consideration, however, we are convinced that the ordinance merely provided for a reasonable license fee, and that it is valid, as held by the Commission of Appeals in its first opinion reported in 55 S. W. (2d) 792. In that opinion, sections 2, 3 and 5, of the ordinance in question were copied and the questions involved stated as follows:

"The contentions made by defendants in error, which were sustained by the Court of Civil Appeals, are these:

"First, that the ordinance in question was designed to apply only to gasoline filling stations where a part of the street or side walk was used for the installation of a portion of the equipment of the station.

"Second, that, if the ordinance be so construed as to apply to a gasoline station not using the streets or sidewalks for the installation of its equipment, it is unconstitutional and void, in that the legislature is without power to authorize a municipality to levy a tax against a property owner for the exercise of his right of egress and ingress to his property.

"Third, that the ordinance in question in effect levies an occupation tax against defendants in error for the operation of gasoline filling stations, and is therefore void because the city is not authorized to levy such a tax, in the absence of any levy of one by the State."

As to the first two questions, the Commission did not change its views, and since we are in accord with that opinion (55 S. W. (2d) 792) that the first two objections are without merit we deem it unnecessary for us to here discuss them.

1 It is the third question only which we find necessary to here consider at length. Fort Worth is an incorporated city, forty-four square miles in area, and has some two hundred thousand inhabitants, with the usual habiliments of such a city, viz., a charter, a governing body, called a commission, a code of laws

or ordinances, a legal department, a police department, a fire department, etc., with officers, including police officers, inspectors of various classes, a fire marshall, inspector of weights and measures, etc., sufficient to efficiently administer the laws which govern its people and secure them in their lives and property. The total cost of the city government in administering its police powers is not shown in the record, nor does the statement of facts disclose the amount expended by the city in supervision or regulating the business of those who are required to obtain licenses, either as a whole or by classes. The city contains 700 gasoline filling stations. We reproduce one of the three photographs of typical stations introduced in evidence. It will be

observed that the station necessarily makes exclusive use of a large portion of the streets at the curb lines (from 15 to 200 feet, according to the evidence), which must, of course, be kept clear for the ingress and egress of customers. The stations are all on busy streets in close proximity to residences or business houses. In no other business must vehicles so frequently enter and depart over the sidewalks to and from the store-area as they do in the filling station business. The necessary effect of lanes of ingress and egress to and from filling stations is not

only to create traffic hazards to both pedestrians and travelers by car at the points involved, but to remove from the use of the public that amount of space as parking area, and to require diligence and surveillance on the part of the proper officers to keep the driveways open for the use of each station and its customers, and to protect the public from the increased traffic hazards. Moreover, the filling station business is a hazardous one, requiring the utmost care in the handling of oils and high explosives. Potential destruction of life and property by blast and fire exists in every station. Not only do we know these facts from the record, but we take judicial knowledge of them as well, and that gasoline filling stations are subject to police control. 30 Texas Jur., p. 165, sec. 81; Lombardo v. City of Dallas, 124 Texas, 1, 73 S. W. (2d) 475, 482; City of San Antonio et al. v. Humble Oil & Refining Co., 27 S. W. (2d) 868 (Texas Civ. App.); City of San Antonio et al. v. Robert Thompson & Co., Inc., 23 S. W. (2d) 796 (Texas Civ. App.); City of San Antonio v. Rubin, 42 Fed. (2d) 107 (Circuit Ct. of App.); Scott et al. v. Champion Building Co. et al., 28 S. W. (2d) 178 (Texas Civ. App.); Hall v. Mayor & Aldermen of Jersey City et al., 142 Atl., 344 (Sup. Ct. of N. J.); Harz v. Paxton et al., 97 Fla., 154, 120 So.,. 3; Interstate Oil Co. v. City of Orange, 165 Atl., 99 (Sup. Ct. of N. J.).

We shall now examine the record and see what, if anything, the City of Fort Worth has done about this business, and ascertain if the defendants in error have shown that the ordinance in question is either an occupation tax or a revenue measure only, or that as a license fee it is unreasonable. The ordinance was enacted September 1, 1917. The first section makes it unlawful to operate gasoline stations on certain named streets of the city. The second, third, and fifth sections are copied in the first opinion of the Commission of Appeals, which we approved (55 S. W. (2d) 792), and we deem it unnecessary to here quote them. The second section provides a charge of twenty-four dollars ($24) against each filling station, and section 3 requires those who desire a permit to operate a station to apply to the City Tax Collector and pay the charge made. Section 5 makes it an offense to operate a filling station without having the same inspected and approved by the fire marshall, and paying the specified fee. Section 4 makes it the duty of all who install gasoline stations to have them inspected and approved by the fire marshall before beginning operations.

On June 29, 1920, the city enacted Ordinance No. 728 relative to filling stations. The first section makes it unlawful to

"erect, construct, build, operate or maintain a gasoline filling station" without having "first obtained a permit for such purpose from the Board of Commissioners of the City." The second section defines the term "gasoline filling station." Section 3 provides that in granting or refusing a permit to erect such a station the Board shall take into consideration the place where the station is to be established, its proximity to adjoining buildings and residences, the explosive character of the gasoline and oils to be used or sold, the liability of the station to become a nuisance or offense to inhabitants or occupants of adjacent buildings and residences, how long existing filling stations have been in operation, and the consent or acquiescence in the locations by the occupants or owners of adjacent buildings.

Section 4 of the ordinance is the penal section, providing fines for its violations.

However, prior to the adoption of the two ordinances referred to above, the City on November 26, 1915, adopted a comprehensive ordinance (No. 494) relative to the storing and handling of gasoline. This ordinance regulated not only gasoline filling stations but other establishments using gasoline as well. The several sections of the ordinance which apply to filling stations are copied or described below in the margin of this opinion.[1]

The object and purpose of the ordinance are set forth in Section 44, which reads:

"Sec. 44. *The object, purpose and end of this ordinance is hereby declared to be the prevention of fires and designed to protect life and property* and the passage of same is hereby de-

---

[1]"ORDINANCE NO. 494.—An Ordinance Regulating the Storage and Handling of Gasoline or Other Volatiles, Within the City of Fort Worth and Providing Penalties for Violations of the Provisions Hereof.

"Be it Ordained by the Board of Commissioners of the City of Fort Worth:

"Section 1. It shall be unlawful for any person, firm or corporation to keep, store or handle gasoline or other volatiles except upon compliance by the said person, firm, association or corporation, with the following provisions of this ordinance.

"Sec. 2. A permit to store and handle gasoline or other volatiles may be issued by the chief of the fire department or the city fire marshal, upon a written application giving in detail the following information:

"(a) Name and address of the applicant.

"(b) Location of premises.

"(c) Nature of construction of the building, and other purposes, if any, for which the building is used.

"(d) Description and maximum quantities of volatile inflammable oil to be stored.

"Sec. 3. Each application for a permit to store and handle gasoline or other volatiles shall be accompanied with a detail plan of the premises.

"Sec. 4. (a) All tanks shall be installed outside of the building under-

clared to be imperatively necessary for the immediate preservation of the public peace, health and safety of the lives and property of the citizens of the City of Fort Worth." (Italics ours.)

This ordinance regulates in detail the erection of buildings for, and the installation of equipment to be used in the storing and handling of gasoline, all directly related to the safety of the city and its inhabitants. The terms are not only applicable to the original construction and installation of the station, but that they continue to be applicable at all times thereafter. Under the language employed, in the light of its declared object, no other interpretation of the ordinance is admissible.

The evidence shows that the city receives in license fees about $15,000 per annum from its 700 filling stations. The evidence shows that the filling stations do not use the curbs and sidewalks other than for ingress and egress of vehicles owned by the operators and by the public as well. According to the testimony of George Hale, Captain of Police and Director of Traffic of the city, the city has a regulation prohibiting the blocking of driveways into and out of filling stations. He said: *"We don't allow the public to block any driveway. There is such a regulation."* Mr. Sullivan, the Supervising Agent of the Gulf Refining Company, testified for the defendants in error that the public did not block their driveways, but that "the police do not keep them clear for us." His explanation of the unblocked driveways of his Company was:

"The boys (meaning his station employees) just tell them to move up a little bit or something like that, but no police ever comes around. *Everybody knows that space there is not*

---

ground and not less than two feet below the surface entirely surrounded by earth, well tamped in place, bottom of tank set on not less than six inches of concrete, and the top of the tank must be below the level of the lowest pipe line in the building used in connection with the equipment.

"(b)  If impracticable to locate storage tanks outside of buildings they may be buried two feet below the level of the basement floor imbedded in the earth, and covered by at least two feet of earth and concrete.

"(c)  All tanks of 560 gallons capacity shall be made of at least twelve (12) gauge galvanized steel or one-fourth-inch black open hearth tank steel. All tanks of 275 gallons capacity shall be made of at least fourteen (14) gauge galvanized steel or three-sixteenth-inch black open hearth tank steel. All tanks of 120 gallons capacity shall be made of at least sixteen (16) gauge galvanized steel or three-sixteenths-inch black open hearth tank steel. All tanks made of galvanized steel must be carefully riveted and soldered and coated on the outside with tar or other rust-resisting material. All tanks made of black steel must be carefully riveted and caulked and coated on the outside with tar or other rust-resisting material. No tanks shall have openings or pipe connections except on the top thereof and shall be properly vented and shall not be connected either directly or indirectly with any public or private sewer drain, catch-basin or pit.

"(d)  Filler pipes must be made of galvanized iron pipe two inches or

*to be used for parking. Everybody knows that part of the street is taken out of use of the public for parking purposes."*

This witness further said:

"We don't allow the oils and grease products that I described a while ago to accumulate in our filling stations in large quantities. If they did accumulate in our filling stations that would constitute a fire hazard. *I don't know whether someone ought to inspect those premises to see whether those oil products are accumulating or not. That is the city's job.*

\*     \*     \*     \*

*"All of our patrons must pass and carry their vehicles over the sidewalks into our premises and after they have been served they pass again out over the sidewalks."* (All italics ours.)

Mr. Conway, Land Agent for plaintiff in error, testified that certain duties were imposed on him with reference to erection of filling stations and as to the initial steps taken when one desired to erect a filling station. In part he said:

"As a rule they come to me to find out if a station could be located at a certain point before they buy the property. The Gulf have consulted me with reference to this matter many times. *The people proposing to build go to the Central Fire Hall, to Mr. Ligon, and fill out a blank and bring it to the building inspector, and from there it comes to me and I have got then on orders from the Council or City Manager—they will not pass on one until I make a report on it. Then I locate the site, find out where they are going to put their pumps, find out if they are back on their property, and if in residential sections*

---

more in diameter, entering at the top of the tank and extending to the bottom of the same. The upper end of said filler pipe must terminate in a screw cap securely locked. Where tanks are located under the building the filler pipe must run to the outside of the building on a gradient and terminate in a screw cap; same to be securely locked. Where filler runs to the sidewalk or to an alley or public way, it must terminate in a screw cap securely locked and protected by a cast iron filler box, the same to flush with the sidewalk, alley or public way. The cover of the said filler box to be securely locked.

"(e) The vent pipe shall be at least one inch in diameter, shall run from the tank to the open air at least four feet above the roof of the building in which or in front of which gasoline is stored, and shall be at least ten feet from the nearest wall of any adjoining building, and well braced in position and shall be provided with a double gooseneck spark protector, both openings of which must be covered with a brass wire screen of at least thirty mesh.

"(f) Pipe connecting the tank with the pump must be of galvanized iron and must enter top of tank. Said pipe must be buried at least eigheen inches below the surface and any exposed portion thereof must be thoroughly and properly protected. This connection pipe must not be lower at any point than where same leaves the tank.

"Sec. 5. All gasoline and other volatiles must be drawn from tank by

*make inquiries for three hundred feet in any direction to find if they will be objectional, and make my report to the Council.* I have nothing to do with suggestions as to the design of the stations. *I make an examination with reference to the set-back regulations in every case.* I do that for the purpose of ascertaining whether or not building lines are uniform. I can't say that I make any investigation with reference to fire hazards other than to notice that they are building in the center of a block. I take, of course, into consideration what is adjoining this property. *I write a letter to the Council in every case covering the full details and that ends my jurisdiction with it.*" (Italics ours.)

Mr. Ligon, Assistant Fire Marshall (Acting Fire Marshal), testified that it was a part of his duties to inspect gasoline filling stations and all other places storing or using gasoline and oil products. In part he said:

"A portion of my time is given over to the inspection of filling stations. Quite a bit of my time is taken up in making inspections at filling stations. *In connection with my duties as Assistant Fire Marshall in the City of Fort Worth, Gulf Filling Stations require my constant surveillance.* After they are installed I don't make periodical inspections, but if I have occasion to pass by the station, of course, I naturally look them over as I would any other hazard in making my rounds over the city. *It is true that I frequently receive complaints with refer-*

---

means of an approved pump or pumps which shall have an automatic check-valve between the pump and the nozzle.

"Sec. 6. Where gasoline or other volatiles are stored or handled the lighting shall be done by incandescent electric lights, with all electric switches and cutoffs permanent located at least twelve inches above the floor.

"Sec. 7. No gasoline or other volatiles shall be kept in any building except when stored or handled in self-closing safety containers or in portable filling tanks. (This Section continues, giving elaborate specifications for tanks and containers within its purview, and defines safety devices for their operation.)

"Sec. 8. There shall be kept at all times receptables filled with sand to be used in absorbing waste oil, and in addition to this there shall be kept in a convenient place a handscoop to be used for fire extinguishing purposes only.

\*　\*　\*　\*　\*

Following the above are many other sections having for their purpose the protection of the public against the careless installation of gasoline tanks, pipes, etc. Other sections of the ordinance read:

"Sec. 29. It shall be unlawful for any person, firm, or corporation to discharge any volatile inflammable oil into a public drain or sewer.

\*　\*　\*　\*　\*

"Sec. 31. No stove, forge, torch, boiler, furnace, flame or fire, and no

*ence to filling stations; I do have them. I make an inspection as soon as possible when I receive a complaint.*

\* \* \* \*

"It is my understinding that Mr. Moore, the Weights and Measures Inspector, makes a periodical inspection as to measures, and he naturally comes in contact with the pumps, and quite often he has called me several times on different occasions. I have devoted my time to inspections upon Mr. Moore's request.

\* \* \* \*

"Any where that gasoline is handled and conveyed from a tank or receptacle to a car there is a hazard there, of course. *I have known of several cars burning while they were being filled with gasoline;* that is, I have known of the cars and stations both burning up.

"I have been engaged in this character of work for about four years. I have known of plenty of cars being burned up on the road where there was no filling station. *As a general rule the hazard is when the car is being filled up with gasoline.* \* \* \* *The fires usually start while they are filling the automobile; while there is more or less gasoline vapor there. I don't know just exactly how many times in all my experience I have known such a condition to exist. I could recall several; I would say fifteen or twenty, I guess.* I have been engaged in this particular work about four years.

"It would be pretty hard to determine what portion of my time is given in connection with the inspection of sidewalks leading into filling stations. *I inspect the sidewalk at each*

---

electric or other appliance that is likely to produce an exposed spark, shall be installed in any room or compartment in which volatile oils are stored or used.

\* \* \* \* \*

"Sec. 37. It shall be unlawful for any person to smoke or to carry a lighted cigar, cigarette or pipe into any room or compartment in which volatile inflammable oil is stored or used."

By Section 38 it is made unlawful to permit smoking in rooms, etc., where gasoline is kept, and anti-smoking signs are required.

Section 39 of the ordinance defines some of the terms used, among which is sub. (g), reading as follows:

"(g)    The term 'CHIEF OF THE FIRE DEPARTMET OR FIRE MARSHAL' shall include any officer, member or inspector of the fire department specially deputized by the chief of the fire department or fire marshal to act for him.

\* \* \* \* \*

"Sec. 41. Any person, firm, corporation or association violating any of the provisions of this ordinance shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not less than $5.00 nor more than $200.00."

station that I inspect, on each new one that goes in, or any addition to it. I am talking about the inspections I make both when they first open up and at the subsequent times.

\* \* \* \*

"There are a number of businesses that are considered fire hazards. *The filling stations and service stations are considered fire hazards. I have assistants in my office in the inspection of fire hazards. Those men devote their entire time to that line of work; to inspecting fire hazards throughout the City of Fort Worth. That is necessary in the proper supervision, control and surveillance of the fire hazards in the City of Fort Worth.* (All italics ours.)

George Hale, Captain of Police for the City and Director of Traffic, in part testified:

"*Constant surveillance is given to filling stations by the Police Department of the City of Fort Worth in this way:*

"*The officers are detailed, the traffic officers, to watch the traffic and traffic hazards, and so forth, and they naturally watch those as much as they would anything else where they are crossing over the sidewalks. I have observed that cars do cross over the sidewalks in entering filling stations. That does interfere with traffic on the streets adjacent to the filling stations.* It interferes with pedestrian traffic. If there is any along at that time and as a car starts out, they have got to stop and let the car come out, or take a chance of letting the car run over them in coming out. *We don't allow the public to block any driveway. There is such a regulation.*

\* \* \* \*

"*I give my traffic squad instructions to observe carefully those particular points or locations where the traffic is heaviest. They have their orders to watch the traffic on all corners where hazards are being operated. They have their orders to watch those, and they do watch them.*" (Italics ours.)

George E. Moore, Weights and Measures Inspector of the City, in part testified:

"*I have occasion to inspect the pumps and the measuring devices of filling stations within the City of Fort Worth. I inspect the measuring devices of the Gulf Refining Company. Over fifty per cent. of my time is dedicated to the surveillance of these filling stations.*

"*I am a commissioned officer of the City of Fort Worth. I have instructions from my superiors in making inspections of weights and measures, to observe any other unusual condition which might be detrimental to the health and welfare of the*

*citizens of this community. I do that in the way of fire hazards —in the way of fire hazards or any incendiary conditions, through my department. I observe the stations when I go in to make weights and measures inspections for the purpose of ascertaining whether there is an existing fire hazard. I have found such. Upon finding an unusual condition which appears to be dangerous to me, if they will not fix it immediately, I notify Mr. Ligon and he takes care of it through his channels. I don't know in just what way he goes through with it, whether he takes care of it personally or otherwise.*

"I have nothing to do with driveways. They generally keep them in good shape—some don't.

\* \* \* \*

"I do not know of any other business which is carried on in Fort Worth attendant with the dangers that the filling station business is. In my opinion gasoline is the biggest fire hazard in the world." (Italics ours.)

The revenue derived by the City from the $24 per annum license fee goes into the general funds of the City.

2 There were introduced in evidence two types of licenses used by the city at different times, the first offered by the defendants in error, and the second by the city. Both receipts, in our opinion, represent the same thing, viz.; money paid for a license to operate a gasoline filling station. By each the granting of a *license* is evidenced. In the first it is called an "occupation *license,*" and in the second a *"license* tax." Both on their faces provide: "This *license* is to be conspicuously displayed at the place of business." In neither instance is the sum collected called an "occupation tax," but in one the charge is made for an "occupation *license,*" and in the other for a *"license* tax." Obviously, both mean the same thing, that is, the charge or exaction provided for in Section 2 of Ordinance 591 here involved. (Italics ours.)

The above is a sufficient statement of the material evidence on the issue before us.

The insistence that the ordinance here involved levies an occupation tax rather than a charge for license to operate filling stations is without merit under this record. The city had no authority under our statutes and constitution to levy such an occupation tax, and we shall not presume that in the enactment of this measure the City Commission passed a void measure. On the contrary, the presumption is that the city authorities intended to adopt a valid ordinance. 27 Texas Jur., p. 871, sec. 21.

3,4  An occupation tax is levied primarily for the purpose of raising revenue, and unless the measure before us is primarily a revenue measure, it is not an occupation tax. 27 Texas Jur., p. 894, sec. 48; Davis v. White, 260 S. W., 138 (writ refused). A license law is one which confers upon those who comply therewith a right denied all others, and it is immaterial whether or not it provides a fee therefor. 27 Texas Jur., p. 868, sec. 18. An official license may be said to be a permission granted by public authority to carry on a business or trade or perform other acts which are forbidden by law except to persons obtaining such permission. 27 Texas Jur., p. 863, sec. 11. The fact, however, that the effect of a licensing ordinance does incidentally raise revenue does not militate against its validity. Ex parte Gregory, 20 Texas App., 210, 220; 54 Am. Rep., 516, 523.

5  The three ordinances before us are *in pari materia* and must be construed together. The rule is well stated in 27 Texas Jurisprudence, p. 870, sec. 20, as follows:

"In construing a license law, a court will seek to ascertain and give effect to the legislative intent. Every part of the act will be considered, so as to make all parts harmonize, if practicable, and give a sensible effect to each. But the court is not confined to a consideration of the language used in an enactment. In determining the meaning, scope and purpose of an act, it may be read in connection with statutes *in pari materia;* and judicial notice may be taken of conditions of common notoriety existing at the time of its enactment, including the habits of the business relating to the subject matter embraced within the law. Moreover, a license law will be given a reasonable construction, with a view to meeting the mischief and advancing the remedy, and in order to sustain the validity of the enactment."

Not only must we interpret the three ordinances before us together, but we must consider them in connection with the machinery of the entire city government, erected and maintained for the purpose of securing compliance with all of its ordinances. The ordinances before us are not merely isolated decrees relating to the subject, but a part and parcel of the general laws of the city, to be executed and their fulfillment secured by the agencies and authorities erected and maintained by the city for the maintenance of a municipal government, and the enforcement of all its ordinances, rules and regulations.

An examination of the ordinances in detail at once discloses elaborate provisions governing the erection and maintenance of

gasoline filling stations.   Ordinance No. 494, heretofore quoted, adopted as early as 1915, regulates in the minutest particular the storage and handling of gasoline.   This ordinance, obviously regulatory, was enacted under the police power for "the prevention of fires and designed to protect life and property."

To see that the ordinance is continuously obeyed is a part of the duties of the legal, police, and fire departments of the city, through any and all agencies which they maintain to detect violations of law and punish offenders, including, of course, police, detective, fire marshals, inspectors, etc.   The method of operating under these ordinances is disclosed by the record. The evidence of Mr. Conway, the Land Agent of the City, quoted above, shows the initial steps which must be taken to secure a permit to erect a filling station.   He goes upon the ground, makes a detailed examination and written report "covering full details."   After a permit has been obtained, and the station erected, it is not permitted to open until it has been inspected, as we have seen from the testimony of Mr. Ligon, the Acting Fire Marshal.   The evidence shows that after stations are erected and lawfully opened, while the Fire Marshal's Department does not make periodical inspections for fire hazards, he and his staff follow the business generally of looking after fire hazards, and upon notice or complaint inspect any particular station.   However, periodical inspections are made by the Inspector of Weights and Measures, who also observes and reports fire hazards.   The inspection of the measuring and filling devices by the city is a matter of very great importance not only to the public in insuring careful and honest measurements and the handling of gasoline in a safe and standard manner, but is of decided advantage to the honest station operators in that it prevents the competition of those who may attempt to give short measures in gasoline and oil sales.   The evidence of Mr. Hale, Captain of Police and Director of Traffic in the City, shows that "constant surveillance is given to filling stations by the police department," particularly with reference to traffic and traffic hazards, and that the police do not permit the station driveways to become blocked.

Ordinance No. 728, defining a gasoline filling station, limiting the places of erection with reference to other structures, and requiring a permit for its erection, is so obviously a regulatory measure that its discussion seems unnecessary.

6   The same may be said of Ordinance No. 591, Section 2 of which levies the charge of $24 per year, of which complaint is made.   In the first place, the ordinance in Section 1 prohibits

the erection of filling stations on certain named streets. In the second place, a permit is required as to all erections where filling stations are lawful. The provisions of this ordinance read in connection with those of Ordinances Nos. 725 and 494 leave no room for doubt that its purpose, too, is regulatory. The charge here involved is found in Section 2 of one of the three ordinances regulating the filling station business. It is a part and parcel of the city's regulatory system, and unless the charge is unreasonable, its validity must be sustained. The amount of this charge, viz., $24 per annum for each filling station, is under the law prima facie valid, and unless its unreasonableness has been made to appear it must be sustained. McQuillin on Municipal Corporations (2nd ed.), vol. 3, p. 486, sec. 1102. As said by the authority cited:

"Ordinances imposing license taxes under the power to regulate are prima facie valid, and the unreasonableness of the exactions must be made clearly to appear, and they must be obviously and largely beyond what is needed for the purpose intended, before such legislation will be declared void. The fact that the exaction may result in producing a revenue in excess of that required for regulation, does not in itself destroy the regulatory character of a police measure."

Or, as said by Corpus Juris, vol. 37, p. 187, sec. 36:

"In the absence of positive evidence to the contrary, however, such acts or ordinances are presumed to be reasonable, and the courts will not interfere unless their unreasonableness and oppressiveness is clearly apparent, the burden of proving their unreasonableness of invalidity being on the one who asserts it, usually the licensee."

As to the reasonableness of a license fee, the rule is that the sum levied cannot be excessive nor more than reasonably necessary to cover the costs of granting the license and exercising proper police regulation; or, as stated in another way, the sum levied should bear some reasonable relationship to the legitimate object of the licensing ordinances. McQuillin on Municipal Corporations (2nd ed.), vol. 3, p. 483, sec. 1102; Texas Jur., vol. 27, p. 893, sec. 47. The rule is stated by McQuillin as follows:

"Where the exaction is imposed under the power to regulate or in the exercise of the police power, as distinguished from the power to tax for revenue, as heretofore explained, the general rule obtains that the sum levied cannot be excessive nor more than reasonably necessary to cover the costs of granting the license and of exercising proper police regulation. The nature of the business sought to be controlled and the necessity

and character of police regulations are the dominating elements in determining the reasonableness of the sum to be imposed. What would be fair and reasonable in one kind of business might well be considered unfair and unreasonable in another kind. This difference is fully recognized by the judicial decisions, and has been made the basis for close distinctions.

"The judicial view is that much should be left to the discretion of the municipal authorities. Where under undoubted charter power, the tax is imposed for revenue alone, or for police regulation and revenue, the amount thereof is usually a matter for determination by the legislative branch of the municipal government. Ordinarily the courts will decline to interfere on the ground that the amount is oppressive or unreasonably large. They incline to defer to the judgment and discretion of the corporate authorities, and frequently presume that the amount demanded is reasonable, particularly in the absence of evidence to the contrary."

In Texas Jurisprudence, just cited, the rule is thus stated:

"The constitution contains no provision specifically limiting the amount of a charge which may be imposed by way of a license fee, it being sufficient that such a charge is reasonable for purposes of regulation when tested by general constitutional guaranties. Although a narrower rule will be applied in the case of a grant made solely for the purpose of regulation, the discretion of a licensing authority will not be disturbed unless it clearly appears that the sum levied has no relation to a legitimate object."

In the instant case there is no evidence of any probative value that the exaction of $24 per year from filling station operators in Fort Worth is unreasonable.

7 The burden was on the defendants in error to show that the exaction bore no reasonable relationship to the duties to be performed by the city and its officers with reference to the gasoline station business. This burden the defendants in error have not in any essential respect discharged. The cost to the city of exercising its police control over gasoline stations has not been either ascertained or estimated. The burden was not on the city to show what it actually did in this respect. The legal presumption that the exaction is reasonable relieved the city of that task. The duty to enforce the city's ordinances and regulations relative to filling stations has been discharged with such efficiency that the law is obeyed usually as a matter of course. But back of this obedience to the law is the fact that the city maintains an efficient force of sufficient size to perform every

duty and check every violation of the law, and must, of course, pay the expense of such maintenance. The potentialities as well as the actualities of police and fire control are of very great benefit to the filling station business,—not only in the sense that they are of value to all citizens, but in the sense that they are of greater value to the filling station business because of its necessity and hazards—its inherent danger from fire and explosion, and its *sui generis* use of streets and sidewalks. Indeed, in fixing a license fee, it is proper to take into consideration not only the expense incident to the particular ordinance and others with reference to the direct regulation of the business, but all the incidental consequences to which the city may be subjected because of the business licensed. Ex parte Gregory, 20 Texas App., 210, 54 Am. Rep., 516; Cooley on Taxation (4th ed.), vol. 4, sec. 1809, p. 3555. The fact that this ordinance does not contain all the regulatory features it might appropriately have contained, of which it was contemplated filling stations should be subjected to, does not in the least militate against its validity or demonstrate that its purpose was solely to raise revenue. City of Texarkana v. Hudgins Produce Co., 112 Ark., 17, 164 S. W., 736; City of New Port v. Young, 173 Ark., 785, 293 S. W., 711; 27 Texas Jur., p. 869, sec. 19; Lowery v. English, 299 S. W., 478 (writ refused); Prater v. Storey, 249 S. W., 871.

8   The fact that the revenue derived from the license fees here involved is paid into the general funds of the city does not show that it is a revenue measure merely, or that it is an occupation tax rather than a license fee. Ex parte Gregory, 20 Texas App., 210, 54 Am. Rep., 516; Brown v. City of Galveston, 97 Texas, 1; see also Atkins v. State Highway Dept., 201 S. W., 226. That the City of Fort Worth was clothed with authority to enact licensing ordinances to regulate gasoline filling stations is not seriously questioned in this case. In fact, the argument of counsel for the Gulf Refining Company in support of the Motion for Rehearing states that "the power to regulate short of price fixing is conceded." The statutes and the charters of the city are ample authority for the exercise of the power.

9   There is no merit in the insistence made in the argument mentioned, and in some of the arguments filed by *amici curiae,* that the language employed in Subdivision 6 of the Amendment to Article 7065, Chapter 88, p. 184, Acts of the Second Called Session of the 41st Legislature, rendered invalid the ordinance here involved. The Act referred to has no application to ordi-

nary retail filling stations. Its purpose was to impose a tax on the sale or distribution of gasoline by wholesale, and the prohibitory language used was intended to apply only to sales and distributions of that character.

Photostatic copies of receipts used by the city, as stated above, were introduced in evidence. The form of receipt used by the collector could not control the meaning and purpose of the law providing for the license fee.

The obvious fact remains that, construing and interpreting the three ordinances heretofore described together, in the light of the city-government organization, the city in the exercise of its police power *has* regulated the filling station business and exacts the fee here involved as a part of that system and under that power. The fee is plainly a license fee, and since there is no evidence that the exaction produces revenue so unrelated to the police control of the filling station business as to be unreasonable, it must be held valid.

The judgment of the Court of Civil Appeals is reversed and that of the District Court is affirmed.

Opinion delivered May 22, 1935.

Rehearing overruled July 3, 1935.