

# THE ATTORNEY GENERAL
## OF TEXAS

October 5, 1988

JIM MATTOX
ATTORNEY GENERAL

Honorable Stan Schlueter
Chairman
Ways and Means Committee
Texas House of
   Representatives
P. O. Box 2910
Austin, Texas 78769

Opinion No. JM- 963

Re: Whether a proposed delivery fee on petroleum products, used to create a state clean-up fund to comply with federal standards, would be subject to the provisions of article VIII, section 7-a, of the Texas Constitution (RQ-1449)

Dear Representative Schlueter:

Subchapter IX of title 42 of the United States Code governs the regulation of underground storage tanks containing "regulated substances" as defined in the code, principally petroleum and other substances defined as "hazardous." See 42 U.S.C. §§ 6991-6991i. The subchapter authorizes the administrator of the Environmental Protection Agency to promulgate rules regarding, inter alia, "release detection and release prevention" of such substances arising from the operation of such tanks, as well as corrective action to be taken by owners or operators. It further confers on the administrator authority to approve state programs that are intended to comply with the federal statutes and rules. When the state program is approved, it is to be enforced in lieu of the federal program, with primary enforcement responsibility falling upon the state. See 42 U.S.C. § 6991c.[1]

---

1. In order to comply with the federal provisions, Texas has enacted laws governing underground storage tanks, set forth in subchapter I of chapter 26 of the Water Code. Section 26.346 of the Water Code provides that, except as specifically provided, all underground storage tanks must be registered with the Texas Water Commission. Pursuant to rule-making authority conferred by that section, the

(Footnote Continued)

Pursuant to subsections 9003(c) and (d) of the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendments of 1984 and the Superfund Amendments and Reauthorization Act of 1986 (codified at 42 U.S.C. §§ 6991b (c), (d)),[2] the Environmental Protection Agency has published proposed rules that impose financial responsibility standards upon the owners and operators of underground storage tanks containing petroleum. See 52 Fed. Reg. 12,786 and 48,638 (to be codified at 40 C.F.R. § 280). The rules establish requirements to be met by owners or operators of underground storage tanks for demonstrating

_____

(Footnote Continued)
commission has imposed a registration fee of $25 for every underground storage tank. Section 26.352 of the code confers authority on the commission to adopt requirements regarding financial responsibility arising from the operation of such tanks:

> The commission shall adopt requirements for maintaining evidence of financial responsibility for taking corrective action and compensating third parties for bodily injury and property damage caused by sudden and nonsudden accidental releases arising from operating an underground storage tank.

Section 26.352 was included in Senate Bill No. 779 when subchapter I was added by amendment in 1987. Acts 1987, 70th., ch. 277, § 1 [hereinafter Senate Bill No. 779]. The commission has not yet adopted any rules regarding financial responsibility.

2. Subsection (d)(1) of section 6991b provides:

> Financial responsibility required by this subsection may be established in accordance with regulations promulgated by the Administrator by any one, or any combination, of the following: insurance, guarantee, surety bond, letter of credit, qualification as a self-insurer or any other method satisfactory to the Administrator. In promulgating requirements under this subsection, the Administrator is authorized
> (Footnote Continued)

their financial responsibility, and giving proof of their ability to take corrective action and to compensate third parties for bodily injury and property damage caused by both sudden and gradual accidental releases arising from the operation of such tanks. The proposed rule requires coverage in the amount of one million dollars per occurrence. You claim that owners and operators of these underground storage tanks, for the most part, are unable to secure insurance coverages in this amount for pollution clean-up. You indicate in your request letter that petroleum marketers in Texas are promoting legislation that would create, in effect, a clean-up fund that is intended to satisfy the financial responsibility standards set forth in the federal rules.[3]

The statute that you propose would provide that funds for the program would be administered by the Texas Water Commission.[4] The funds would derive from a proposed "delivery fee" of six tenths of a cent ($0.006) per gallon on "regulated substances," as defined in the federal provisions, when they are drawn from the refinery process and pass into the marketing or distribution system.[5] The

---

(Footnote Continued)
> to specify policy or other contractual terms, conditions, or defenses which are necessary or are unacceptable in establishing such evidence or financial responsibility in order to effectuate the purposes of this chapter.

3. We note that section 6991c of title 42 permits the administrator of the Environmental Protection Agency to approve a state program only if the requirements of that program are no less stringent than the corresponding requirements under the federal program. See Water Code, § 26.357.

4. You have not asked us to construe any specific proposed statute; rather, you ask in general about a statute that would create a dedicated clean-up fund. Accordingly, we do not place our imprimatur upon any specific proposed statute or any specific proposed language.

5. We note that the fact that the charge is measured by the amount of "regulated substances," including petroleum, does not mean that the charge is a tax on
(Footnote Continued)

proposed fee would be treated by the marketers and distributors as a "cost of product," similar to a transportation charge, that would not be recovered as a tax on consumer use. The revenues thus generated would be dedicated to establishing a back-up fund for pollution clean-up costs over and above the $10,000 of liability coverage to be assumed by the owner/operator for each site. You do not ask whether the proposed legislation would satisfy the proposed federal rule; rather, you ask two questions regarding Texas law and the proposed statute:

> 1. Would the fee, as described above, fall within the purview of Texas Constitution Article 8, Sec. 7-a, and require use of the funds in highway construction after the one-fourth allocation to the Available School Fund?

> 2. If the answer to No. 1 is "No," then is the Legislature authorized to make a statutory dedication of the fees to the Texas Water Commission for regulation of the clean-up fund?

We answer your first question in the negative; such funds would not fall within the ambit of article VIII, section 7-a, of the Texas Constitution. We answer your second question in the affirmative; the legislature is empowered to dedicate by statute the funds derived from such a fee as you propose for the purpose of securing pollution clean-up.

You first ask whether the proposed fee falls within the ambit of article VIII, section 7-a, of the Texas Constitution, which provides:

> Subject to legislative appropriation, allocation and direction, all net revenues remaining after payment of all refunds allowed by law and expenses of collection derived from motor vehicle registration fees, and all taxes, except gross production and ad

---

(Footnote Continued)
petroleum. Because we conclude that the charge is not a tax in the first instance, we need not determine the incident upon which the charge is imposed.

> valorem taxes, on motor fuels and lubricants
> used to propel motor vehicles over public
> roadways, shall be used for the sole purpose
> of acquiring rights-of-way, constructing,
> maintaining, and policing such public
> roadways, and for the administration of such
> laws as may be prescribed by the Legislature
> pertaining to the supervision of traffic and
> safety on such roads; and for the payment of
> the principal and interest on county and road
> district bonds or warrants voted or issued
> prior to January 2, 1939, and declared
> eligible prior to January 2, 1945, for
> payment out of the County and Road District
> Highway Fund under existing law; provided,
> however, that one-fourth (1/4) of such net
> revenue from the motor fuel tax shall be
> allocated to the Available School Fund; and,
> provided, however, that the net revenue
> derived from counties from motor vehicle
> registration fees shall never be less than
> the maximum amounts allowed to be retained by
> each County and the percentage allowed to be
> retained by each County under the laws in
> effect on January 1, 1945. Nothing contained
> herein shall be construed as authorizing the
> pledging of the State's credit for any
> purpose. (Emphasis added.)

Tex. Const. art. VIII, § 7-a; see Tax Code, ch. 153.

The issue is whether the proposed "delivery fee" is a "tax" for purposes of article VIII, section 7-a, of the Texas Constitution. If it is, then the funds derived therefrom may be expended only pursuant to that section of the constitution.

Courts in Texas uniformly have held that, in determining whether a statutorily created charge is a tax or a license fee, the test is that of purpose. If the overall primary purpose of the charge is to raise revenues, then it is a tax; if its primary purpose is regulation, then it is a license fee. Robinson v. Hill, 507 S.W.2d 521 (Tex. 1974); County of Harris v. Sheppard, 291 S.W.2d 721 (Tex. 1956); Hurt v. Cooper, 110 S.W.2d 896 (Tex. 1937), after certified questions, 113 S.W.2d 929 (Tex. Civ. App. - Dallas 1938, no

writ); <u>City of Fort  Worth v. Gulf  Refining Co.</u>, 83  S.W.2d 610 (Tex. 1935).[6]  The Texas Supreme Court has declared:

> It is  sometimes difficult  to determine whether a given statute should be classed  as a regulatory  measure or  as a  tax  measure. The  principle  of  distinction  generally recognized is that when, from a consideration of  the  statute  as  a  whole,  the  primary purpose of the fees  provided therein is  the raising of  revenue, then  such fees  are  in fact occupation taxes, and this regardless of the name by  which they  are designated.   On the  other  hand,  if  its  primary  purpose appears to be  that of  regulation, then  the fees levied are license fees and not taxes.

<u>Hurt v. Cooper</u>, <u>supra</u>, at 899.

It is  suggested that,  under the  authority of  <u>Conlen Grain and Mercantile, Inc. v. Texas Grain Sorghum  Producers Board</u>, 519 S.W.2d 620 (Tex. 1975) [hereinafter <u>Conlen</u>],  the charge that you propose should be denominated an  occupation tax rather then a license fee.  We disagree.  In <u>Conlen</u>, the Texas Supreme Court held  unconstitutional a charge  imposed upon grain sorghum producers; the court held that the charge was an occupation tax on an agricultural pursuit, a tax that article VIII, section 1, of the Texas Constitution explicitly forbids.

The statute in <u>Conlen</u> authorized a nonprofit  organization representing the producers of a particular agricultural

---

6.  We note that, because the test is purpose and  not effect, a charge may have the effect of raising revenue  and not be  a  tax.  <u>Beckendorff  v.  Harris-Galveston  Coastal Subsidence District</u>, 558 S.W.2d 75 (Tex. Civ. App. - Houston [14th Dist.] 1977), aff'd <u>per  curiam</u>, 563 S.W.2d 239  (Tex. 1987); <u>City  of  Fort Worth  v.  Gulf Refining  Co.</u>,  <u>supra</u>. Indeed, a license fee imposed on the privilege of  operating a  certain  type  of  business  may  be  imposed  for  both regulation and revenue purposes; if the purpose of the  act, taken as a  whole, is  primarily regulatory,  the charge  is denominated a  license  fee.  <u>House  of  Tobacco,  Inc.  v. Calvert</u>, 394 S.W.2d  654 (Tex. 1965); <u>Payne v. Massey</u>,  196 S.W.2d 493 (Tex. 1946).

commodity to petition  the Commissioner  of Agriculture  for
authority to conduct a referendum, on either a regional or a
statewide basis, to determine  whether the producers of  the
commodity would  "levy  an  assessment  upon  themselves  to
finance programs authorized by  this Act."  519 S.W.2d  620,
at 621.  If the referendum passed, then an election was held
to determine  the members  of a  commodity producers  board.
The board  was charged  with formulating  and  administering
programs for the purposes stated in the act.  The board  was
permitted to expend the money collected as an assessment for
the purposes of

> developing, carrying  out, and  participating
> in programs of  research, disease and  insect
> control, predator  control,  education,  and
> promotion,  designed  to  encourage  the
> production, marketing,  and use  of  the
> commodity upon  which  the  assessment  is
> levied.

519 S.W.2d 620, at 621-622.   In rejecting the claim of  the
board that  the charge  imposed was not  a tax,  the  court
stated, <u>inter alia</u>, that: "It also appears that the  primary
purpose of the assessment is to raise revenue."

The court  in  <u>Conlen</u> relied  in  part upon  its  prior
decision of <u>H. Rouw v.  Texas Citrus Commission</u>, 247  S.W.2d
231 (Tex. 1952) [hereinafter <u>Rouw</u>], which involved a  charge
similar to the one in <u>Conlen</u>.  The charge, however, in  <u>Rouw</u>
was nonrefundable and  was imposed on  those who packed  and
marketed or processed  and sold  citrus fruit  grown in  the
state.  The court in <u>Rouw</u> concluded that the purpose of . the
charge was  not  regulatory, but  rather  it simply  was  to
promote the citrus industry:

> Applying the above rule  to the Act  under
> consideration we find the tax levied to be an
> occupation tax.  <u>A reading of the Act clearly</u>
> <u>demonstrates that its  primary purpose is  to</u>
> <u>raise revenue, and  not a  regulation of  the</u>
> <u>citrus fruit industry under the police power.</u>
> Laudable  as the purpose  of the Act may  be;
> viz. to advertise and enlarge the markets for
> Texas citrus fruit  and its by-products,  and
> for  research  beneficial to  the  citrus
> industry,  the  primary  purpose being  the
> raising of revenues in  excess of the  amount
> needed for  regulation of  the industry  to
> carry out  the  above provisions,  under  the

> well-established rule of law, the tax must of necessity be classed as a occupation tax. (Emphasis added.)

519 S.W.2d 620, at 624.

Both Conlen and Rouw are consistent with Texas court decisions that looked to the actual conferral of regulatory authority in determining whether a charge imposed is intended primarily for the raising of revenue. Texas courts consistently have characterized as license fees, rather than as taxes, those charges that were imposed concomitantly with the actual conferral of regulatory authority. See, e.g., Robinson v. Hill, supra; House of Tobacco Inc., v. Calvert, supra; Kadane v. Clark, 143 S.W.2d 197 (Tex. 1940); City of Fort Worth v. Gulf Refining Co., supra; Beckendorff v. Harris-Galveston Coastal Subsidence District, supra; Reed v. City of Waco, 223 S.W.2d 247 (Tex. Civ. App. - Waco 1949, err. ref'd). See also, Prudential Health Care Plan v. Commissioners of Insurance, 626 S.W.2d 822 (Tex. App. - Austin 1982, writ ref'd n.r.e.) (distinguishing Conlen).[7] Texas courts consistently have characterized as taxes, rather than as license fees, those charges that were imposed without the concomitant conferral of actual regulatory authority. See, e.g., Harris County v. Sheppard, supra; Payne v. Massey, supra; Hurt v. Cooper, supra; Ex parte Dreibelbis, 109 S.W.2d 476 (Tex. Crim. App. 1937); Taylor v. State, 513 S.W.2d 549 (Tex. Crim. App. 1974).

There can be little doubt that, by enacting subchapter I of chapter 26 of the Water Code, the legislature intended primarily to set up a system to regulate the operation of

---

7.  The court of appeals declared:

> We believe, however, we would need a more specific declaration of the Supreme Court, overruling the traditional distinction drawn between an occupation tax and a regulatory fee, before we would be justified in holding the charge assessed by subdivision (a) [under article 20A.33 of the Insurance Code] to be a "tax" subject to the "equal and uniform" limitations of the Constitution.

626 S.W.2d 822, at 830.

underground storage tanks  that contain hazardous  materials
rather than a system to raise revenue.  The "Bill  Analysis"
prepared by the  Senate Committee on  Natural Resources  for
Senate Bill No. 779 sets forth the background of the bill:

> In 1986   the  Texas   Water   Commission
> surveyed relevant  businesses  and  concluded
> that there are  at least 120,000  underground
> storage tanks that  would come under  commis-
> sion purview for regulatory authority.  Tanks
> underneath  gasoline  stations  account   for
> 80-85% of that total.  <u>A recent amendment  to
> the  Federal  Resource  Conservation  and
> Recovery Act mandates the implementation of a
> national underground  storage  tank  program,
> which is intended to  be administered at  the
> state  and  local  levels.  Texas  does  not
> currently  have  a  regulatory  program  to
> monitor  and  prevent  leaks  in  underground
> storage tanks  which  contain  petroleum  and
> toxic chemical products.</u>  (Emphasis added.)

The "Bill Analysis" also sets forth the purpose of the bill:
"This bill would provide  for the <u>regulation</u> of  underground
storage tanks  by the  Texas Water  Commission."  (Emphasis
added.)  Section 26.341 of the Water Code states the purpose
of the subchapter:

> The   legislature   finds   that   leaking
> underground tanks storing certain  hazardous,
> toxic, or otherwise  harmful substances  have
> caused and continue  to pose serious  ground-
> water contamination problems  in Texas.  The
> legislature declares that <u>it is the policy of
> this state and the purpose of this subchapter
> to  maintain  and  protect  the  quality  of
> groundwater  resources  in  the  state  from
> substances  in  underground  tanks  that  may
> pollute groundwater resources</u> and to  require
> the  use  of  all  reasonable  methods   to
> implement this policy.  (Emphasis added.)

Moreover, it is clear even from a cursory reading of chapter
26  itself  that   the  legislature   has  conferred   broad
regulatory  authority  on   the  commission  regarding   the
permissible operation  of underground  storage tanks.  <u>See,
e.g.</u>, Water Code, §§ 26.345 - 26.357.  Because the fee  that
you propose would be enacted pursuant to the state's  police
power and in order to comply with federal statutes and rules

regarding the regulation of underground storage tanks, we conclude that it is more closely related to a license fee than it is to a tax and that any money derived therefrom would not fall within the ambit of article VIII, section 7-a, of the Texas Constitution.

You next ask whether the legislature is authorized to make such a statutory dedication, creating a fund to be administered by the Texas Water Commission for the purpose of regulating pollution clean-up. Generally, the legislature is authorized to enact any law not in conflict with either the state or the federal constitutions. Jordan v. Crudgington, 231 S.W.2d 641 (Tex. 1950); DeShazo v. Webb, 113 S.W.2d 519 (Tex. 1938). We understand you to ask whether the creation of such a dedicated statutory fund would be constitutional; however, you do not specify which constitutional provisions concern you. We assume that you fear that article III, section 51, of the Texas Constitution, which forbids the state from making grants of public money to persons or political subdivisions, may be violated by the fact that money in such a fund would be expended both for the costs of pollution clean-up and for compensating third parties damaged by any such accidental leakage, costs which, absent the fund, would be borne by the owners/operators themselves. We conclude that article III, section 51, of the Texas Constitution would not be violated by permitting the expenditure of such money for such purposes.

In Friedman v. American Surety Co. of New York, 151 S.W.2d 570 (Tex. 1941), the Texas Supreme Court upheld the Unemployment Compensation Act, declaring, inter alia, that article III, section 51, was not violated thereby. The act, codified at articles 5221b-1 through 5221b-21, V.T.C.S., created a fund comprising "contributions" or taxes imposed upon employers for the benefit of employees. The court refused to characterize the plan as providing a gratuity, asserting that the funds were not state funds. Rather, the state acted merely as a trustee.

Analogously, in the system that you propose, the state would be acting as trustee with respect to the administration of the clean-up fund. The beneficiaries of the trust would be those persons or political subdivisions that are damaged by the sudden or gradual leakage or spill from underground storage tanks of regulated substances covered by the act. The device of creating a dedicated fund or a trust fund is one that repeatedly has been used by the legislature to effectuate a proper public purpose, both with private persons as beneficiaries, see, e.g., V.T.C.S. art.

8307, (Worker's Compensation and Crime Victims' Compensation Fund); Agric. Code, §§ 103.00-.013 (Produce Recovery Fund), and with political subdivisions as beneficiaries. <u>See, e.g.</u>, V.T.C.S. art. 1066c (Local Sales and Use Tax), 1118x (Metropolitan Transit Authorities), 1118y (Regional Transit Authorities), 179d (Bingo Enabling Act), 4366e (Local Government Corporate Banking Franchise Tax Fund); Alco. Bev. Code, §§ 202.00-.16.   We conclude that article III, section 51, of the Texas Constitution imposes no impediment to the creation and eventual disbursement of the money from the fund that you propose.

### S U M M A R Y

The creation of a proposed pollution clean-up fund by the imposition of a fee on the owners/operators of underground storage tanks containing certain regulated substances for the purpose of complying with federal statutes and administrative regulations would not constitute a "tax" for purposes of article VIII, section 7-a, of the Texas Constitution. Article III, section 51, of the Texas Constitution imposes no impediment to the creation and eventual disbursement of the money from such a fund.

Very truly yours,

JIM MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Jim Moellinger
Assistant Attorney General