**CITY OF HOUSTON, et al., Appellants,**

v.

**HARRIS COUNTY OUTDOOR ADVERTISING ASSOCIATION, et al., Appellees.**

No. A14–92–01123–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 16, 1994.

Rehearing Denied Aug. 4, 1994.

Gilbert D. Douglas, Andrea Chan, Houston, for appellants.

Richard L. Rothfelder, Russell H. McMains, Houston, for appellees.

Before J. CURTISS BROWN, C.J., and MURPHY and ELLIS, JJ.

## OPINION

J. CURTISS BROWN, Chief Justice.

This appeal involves the validity of certain assessments levied by the City of Houston pursuant to the City's sign ordinance (the Sign Code). *See* HOUSTON TEX., SIGN CODE CH. 46. Appellees, Harris County Outdoor Advertising Association (HCOAA) and its individual members brought suit under 42 U.S.C. § 1983, claiming that appellants, the City of Houston, members of the City's Municipal Board on Sign Control, and the City's Sign Administrator (hereinafter referred to as "the City"), violated their constitutional rights by charging excessive operating permit fees for off-premise signs. Appellees sought monetary, declaratory, and injunctive relief. The case was tried before the court which found in favor of appellees and rendered judgment awarding monetary damages and attorney's fees. The court also made extensive findings of fact and conclusions of law, finding that the fees charged by the City between 1985 and 1992 for off-premise operating permits were excessive and in the nature of an unlawful occupation tax in violation of article VIII, section 1(f) of the Texas Constitution and provisions of the U.S. Constitution. The City appeals from the judgment and raises six points of error attacking the court's findings. We affirm.

Appellees are engaged in the business of outdoor advertising which involves the ownership and operation of billboards throughout Houston and the surrounding area. Billboards are "off-premise" signs. *See* SIGN CODE §§ 4603(2), 4612.

Appellees originally filed this suit on January 9, 1987. In their Original Petition, they alleged that the City's enforcement of the Sign Code, including the assessment of substantial permit fees, was in violation of state and federal law and in violation of the Texas and U.S. Constitutions. Following the enactment of City Ordinance No. 89–767, which

doubled the fee for an off-premise operating permit, appellees amended their petition to specifically allege that the City's fees for those permits were excessive and constituted an unauthorized and unlawful tax in violation of the Texas and U.S. Constitutions. Appellees continued to pay under protest one-half of the new fee for an off-premise operating permit to the City and the other half to the registry of the court. By agreed motion, appellees' excessive fee claim was severed and tried before the court beginning on July 20, 1992.

On August 26, 1992, the trial court rendered judgment for appellees. In its Final Judgment, the court found that the City's fees for off-premise operating permits were unreasonably high, unconstitutionally excessive and that $40.00 was a reasonable and constitutional fee. The court awarded appellees $1,403,034.40 as damages. The judgment recites that this figure was computed by subtracting $40.00 (the permit fee declared to be reasonable) from $120.44 (the average permit fee paid by appellees between January 1985 and July 27, 1992) and multiplying that figure by 17,442 (the number of permits purchased by appellees during that period). The court further awarded appellees $326,582.98 in attorney's fees pursuant to 42 U.S.C. § 1988, along with conditional appellate attorney's fees. Finally, in addition to post-judgment interest and court costs, the court awarded appellees $751,732.93, the monies deposited in the registry of the court including interest. The City filed a notice of appeal.

In its first point of error, the City contends that the evidence was legally and factually insufficient to support the trial court's conclusion that the fees for off-premise operating permits constituted an impermissible occupation tax rather than a valid license fee.

As we observed at the outset, the trial court found that a portion of the fees charged by the City for off-premise operating permits constituted an occupation tax and violated article VIII, section 1(f) of the Texas Constitution. That section provides:

The occupation tax levied by any county, city or town for any year on persons or corporations pursuing any profession or business, shall not exceed one-half of the tax levied by the State for the same period on such profession or business.

Tex. Const. art. VIII, § 1(f).

■ This provision prohibits a municipality from levying an occupation tax where no such tax has been previously levied by the State. *Hoefling v. City of San Antonio,* 85 Tex. 228, 20 S.W. 85, 88–89 (1892); *Pierce v. City of Stephenville,* 206 S.W.2d 848, 850 (Tex.Civ.App.—Eastland 1947, no writ). As the trial court correctly found, the State of Texas has not levied an occupation tax on the off-premise sign industry. Therefore, if the fees for off-premise operating permits constitute an occupation tax, as the trial court found, the City violated article VIII, section 1(f) by levying such a tax on appellees.

■ To determine whether an exaction authorized by statute or ordinance constitutes an occupation tax or a license fee, the test is whether the primary purpose of the exaction, when the statute or ordinance is considered as a whole, is for regulation or for raising revenue. *Hurt v. Cooper,* 130 Tex. 433, 110 S.W.2d 896, 899 (1937); *City of Fort Worth v. Gulf Refining Co.,* 125 Tex. 512, 83 S.W.2d 610, 617 (1935). If the primary purpose of the exaction is for regulation, then it is a license fee; however, if the primary purpose of the exaction is to raise revenue, then it is an occupation tax, regardless of the name by which it is designated. *Hurt,* 110 S.W.2d at 899; *City of Fort Worth,* 83 S.W.2d at 617.

■ The City concedes that whether an exaction is for regulation or for raising revenue, involves the question of reasonableness and presents a question of fact. Statutes or ordinances imposing license fees under the police power to regulate are prima facie valid and are presumed to be reasonable. *Id.* at 618. Courts ordinarily will not interfere with this police power. *Id.* Before such legislation will be declared void, the unreasonable and oppressive nature of the exaction must be clearly apparent from the record. *Id.* To be reasonable, a license fee *cannot be excessive nor more than reasonably necessary to cover the cost of granting the license and of exercising proper police regulation,* or *it must bear some reasonable relationship to*

*the legitimate object of the licensing ordinance. Id.* [emphasis added] The nature of the business sought to be controlled and the necessity and character of the police regulations are the dominating elements in determining the reasonableness of the sum to be imposed. *Id.* (citation omitted) What would be fair and reasonable in one kind of business might well be considered unfair and unreasonable in another kind. *Id.* The burden of proving unreasonableness or oppressiveness is on the one who asserts it, usually the licensee. *Id.*

 We hold that appellees have met their burden. As we stated, this case was tried before the court which made extensive findings of fact and conclusions of law. In particular, the trial court found no direct relationship between the payment of fees for off-premise operating permits and the receipt of services. The court also found that the revenue from such fees exceeded the reasonable costs of regulation.[1] The City attacks this finding and others relating to the court's determination that the fees in issue were an occupation tax. In a non-jury case, the trial court's findings of fact and conclusions of law have the same force and dignity as does a jury verdict on special issues. *Buzbee v. Castlewood Civic Club,* 737 S.W.2d 366, 368 (Tex.App.—Houston [14th Dist.] 1987, no writ). Findings of fact are reviewable for legal and factual sufficiency of the evidence supporting them and conclusions of law are reviewable when attacked as a matter of law, but not on grounds of factual sufficiency. *Id.; Mercer v. Bludworth,* 715 S.W.2d 693, 697 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.).

 When both legal and factual sufficiency points are raised we must first examine the legal sufficiency. *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 410 (Tex. 1981). In reviewing a "no evidence" point, we are to consider only the evidence and inferences that tend to support. the trial court's findings and disregard all evidence and inferences to the contrary. *Sherman v.*

*First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex. 1988). A "no evidence" point of error must be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Otis Elevator Co. v. Joseph,* 749 S.W.2d 920, 923 (Tex.App.—Houston [1st Dist.] 1988, no writ) (citing *Commonwealth Lloyd's Ins. Co. v. Thomas,* 678 S.W.2d 278, 288 (Tex.App.— Fort Worth 1984, writ ref'd n.r.e.)). If there is any evidence of probative value to support the trial court's findings, we must uphold the findings and overrule the points of error. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

 If the findings are supported by legally sufficient evidence, we must then review the factual sufficiency of the evidence by weighing and considering the evidence, in support of, and contrary to, the challenged findings. *Id.* The trial court's findings must be upheld unless they are so against the great weight and preponderance of the evidence as to be manifestly unjust or erroneous. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). Because the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony, we may not substitute our judgment for that of the trial court's simply because we may disagree with the court's findings. *Herbert v. Herbert,* 754 S.W.2d 141, 142 (Tex.1988); *Forscan v. Dresser Indus.,* 789 S.W.2d 389, 394 (Tex.App.—Houston [14th Dist.] 1989, writ denied).

Stipulations made prior to trial reflect substantial increases levied upon appellees by the City's Sign Administration. We repeat the substance of those stipulations herein. The Sign Administration is part of the City's Public Works Department and was created when the Sign Code was enacted on May 8,

---

1. The City contends that the trial court applied the incorrect legal test. We find little or no distinction between the court's finding and the legal test first formulated in *City of Ft. Worth.*

Whether an exaction is reasonably necessary to cover the costs of regulation requires an analysis of the relationship between fee revenue and costs of regulation.

1980. *See id.* at §§ 4602, 4604. Between 1980 and 1989, the City enacted six ordinances which significantly increased the fees for operating permits for off-premise signs and/or on-premise signs. Since May of 1980, the annual fee for an off-premise operating permit has increased 450% from $20.00 to $90.00 for the first two hundred square feet. Before 1980, the City, through the Building Inspection Division, charged an annual fee of only $5.00 for the first twenty-five square feet, plus two cents for each excess square foot, for an off-premise operating permit. Currently, the average fee for a three-year, off-premise operating permit for a standard 14 foot × 48 foot off-premise sign is $278.00 or approximately $92.93 per year. Many signs are smaller than the standard size sign and the average fee for those signs is $179.00 for a three-year, off-premise operating permit or approximately $59.67 per year.

Before the last fee increase in 1989, the City commissioned a study by the accounting firm of Deloitte, Haskins and Sells (Deloitte or the Deloitte Study). The purpose of the Deloitte Study was to assist the Sign Administration in assessing its costs. Using its own methodology, Deloitte identified certain services provided by the Sign Administration and determined the cost for each of these services along with the revenue generated by the City from various permit fees.

The Sign Administration's fee proposal to City Council was based in part on the Deloitte findings. That proposal projected $184.00 in costs associated with a three-year, off-premise operating permit and recommended a fee increase from an average of $89.50 to $179.00. Included in those costs were costs of non-revenue producing activities as well as other indirect departmental costs. These non-revenue producing activities included: (1) support of the Municipal Board on Sign Control (the Sign Board) which oversees enforcement of the Sign Code in the City's extra-territorial jurisdiction (ETJ), *see* SIGN CODE §§ 4613, 4616; (2) impoundment of illegal stick and paper signs in the rights-of-way, *see id.* at § 4604(k); and, (3) investigation of violations of the Sign Code, *see id.* at § 4604(b), (d). These activities rarely implicated appellees' businesses.

The proposal to Council regarding the cost allocation of non-revenue producing activities was made after meetings between the director of Public Works and members of the Houston Chamber of Commerce Committee on Signs, which included a member of the on-premise sign industry. The Chamber of Commerce's recommendations when compared to those of the Sign Administration, included fewer cuts in staffing, an increased cost allocation of impoundment activities to off-premise sign owners, and a smaller increase in fees for on-premise operating permits. The Sign Administration adopted all of the Chamber of Commerce's recommendations in its proposal to City Council.

Based upon that proposal, Council passed Ordinance No. 89–767, on May 24, 1989. The ordinance doubled the fee for an off-premise operating permit previously in force from $45.00 to $90.00 for the first two hundred feet and from $.20 to $.40 for each excess square foot. As we noted, for most signs, the City's average fee for a three-year, off-premise operating permit doubled from $89.50 to $179.00, likewise increasing the City's recovery rate from 430.5% to 861%. The ordinance only slightly increased the fee for an on-premise operating permit from $.20 to $.27 for each square foot in excess of the first fifty square feet. The $15.00 charge for the first fifty square feet remained the same.

In light of these stipulations and other evidence offered by appellees, the City made no attempt to disavow these increases. Instead, the City took the position at trial that both the earlier fees and the current average fee of $179.00 for a three-year, off-premise operating permit were reasonable license fees as a matter of law because the revenue from those fees went solely to the City's regulation of the sign industry as authorized by the Sign Code. Thus, the question before this court is whether those fees were excessive or not reasonably necessary to cover the cost of granting the license and of exercising proper police regulation. *See City of Ft. Worth,* 83 S.W.2d at 618.

According to the City, any assessment under the guise of a license fee, no matter how prohibitive or tenuously connected to regulation, is reasonable as long as it

relates to regulation. Were we to accept the City's position, any review of whether the assessment is in fact reasonably necessary to cover the cost of regulation would be prohibited. This is not the state of the law. While there is a presumption that legislative enactments pursuant to police power are valid and reasonable, that presumption does not preclude a factual review of the reasonableness of such enactments by the courts. *See e.g., Taylor v. State,* 513 S.W.2d 549, 550 n. 1 (Tex.Crim.App.1974); *B & B Vending Co. v. City of El Paso,* 408 S.W.2d 545, 549 (Tex. Civ.App.—San Antonio 1966, writ ref'd n.r.e.); *Producers Ass'n of San Antonio v. City of San Antonio,* 326 S.W.2d 222, 224 (Tex.Civ.App.—San Antonio 1959, writ ref'd n.r.e.); *Houston Credit Sales Co. v. City of Trinity,* 269 S.W.2d 579, 580–81 (Tex.Civ. App.—Waco 1954, writ ref'd n.r.e.).

### The Deloitte Study

As we stated, the City commissioned the Deloitte firm to study the Sign Administration's costs and revenue. The results of that study were admitted into evidence. Appellees' expert, Charles Cooper, did a complete analysis of the Deloitte Study and his report was also admitted into evidence. The trial court's findings track much of Cooper's testimony concerning the Deloitte results. During that testimony, Cooper focused on Part II, section B of the Study pertaining to an overview of the methodology. That section provided that: "the methodology utilized in this analysis is guided by the principle that there is a direct relationship between payment of fees and charges and the receipt of services ... the concept of 'all costs reasonably borne' underlies the study's full costing techniques." Based upon that language, Cooper concluded that the concept underlying the methodology of the Deloitte Study was that of a "user fee" or of "user defined services;" that is, there should be a direct relationship between the fee and the service or stated another way, only the user or recipient of the service should have to pay for that service. Cooper likened the user fees in this case to those paid at golf courses. Even the City's expert and the person who supervised the Deloitte Study, Fedor Derek, testified that the methodology underlying the Study

was that of a "user fee" in the "generic sense" and that it required that there be a direct relationship between the payment of fees and the receipt of services.

Cooper also testified that the Deloitte Study found that the cost associated with an off-premise operating permit was $19.73, but that the revenue received by the City from an off-premise operating permit fee was on average $89.50. He noted that an initial run of the Study completed on February 5, 1989, found that the cost associated with an off-premise operating permit was only $8.69 as compared to the average revenue of $89.50 from an off-premise operating permit fee. According to Cooper, under the initial run, revenue from all off-premise operating permit fees exceeded costs by $413,753.00 (a recovery rate of 1,030.5%). Cooper opined that those fees therefore, represented a general revenue raising measure.

After consulting with Sign Administration officials, Deloitte completed a second and final run of the study on March 16, 1989. Cooper testified that the cost associated with an off-premise operating permit found in the second run was higher because it improperly included indirect departmental costs and the costs associated with real estate signs, for which the City already charged a separate $100.00 operating permit fee. According to Cooper, under the second run, total revenue exceeded total costs by only $171,916.00 (a recovery rate of 430.5%). Cooper determined that such a recovery rate could only be characterized as "general revenue raising." Cooper also observed that the recovery rate should have been even higher because the cost associated with an off-premise operating permit should not have included the costs of real estate signs and therefore, should only have been $14.74. Cooper further pointed out that the Deloitte Study found that the revenue from the fee for an on-premise operating permit was on average only $28.75 or slightly more than the $23.14 cost associated with each permit. He also noted that the revenue from an off-premise operating permit fee was 4.5 times greater than the revenue from an on-premise operating permit fee.

The parties stipulated that the work directly connected to the issuance of an off-premise operating permit took approximately forty-five minutes and included one inspection of the sign, the issuance of the permit, and initial record keeping. Based upon that and other stipulations and the results of the City's own study, Cooper concluded that revenue from off-premise operating permit fees was unreasonably high or excessive and had no relation to the cost of services. Cooper's conclusions were essentially uncontroverted by the City's witnesses. In fact, the City's expert, Derek, conceded that "pricing or setting fees in the public sector" was outside his expertise. Thus, based upon the City's own study, the uncontroverted testimony of appellees' expert, and plaintiffs' exhibit number 11 admitted earlier to show the average fees paid by appellees from 1983 to 1992, there was sufficient evidence to support the trial court's finding that the fees for off-premise operating permits were so excessive as to constitute an impermissible occupation tax.

The City argues, citing *City of Ft. Worth,* 83 S.W.2d at 618, that the fact that the exaction may result in producing revenue in excess of that required for regulation, does not by itself destroy the regulatory character of a police measure. Thus, while Cooper's testimony alone concerning the Deloitte Study supports the trial court's finding of an impermissible occupation tax, appellees further sought to prove that the earlier fees and the fees set by Ordinance No. 89-767, were not so much intended to regulate the billboard industry as to raise revenue to remedy the Sign Administration's budget problems caused by its own inefficiency. As we described, Ordinance 89-767 doubled the average fee for a three-year, off-premise operating permit by allocating the costs of non-revenue producing activities to the cost of off-premise operating permit fees. Hence, much of the trial focused on the fees set by that ordinance and on the Sign Administration's budget problems.

### Improper Allocation of Costs

The Sign Administration is financed by the Sign Permitting Fund (Sign Fund) and is supposed to be self-supporting. *See id.* at § 4605(i). Sign owners and operators contribute to the Sign Fund through the payment of various permit fees. *See id.* at § 4605. All fees collected by the Sign Fund are used solely to pay administrative and other related costs of enforcing the Sign Code. *See id.* at § 4605(i). The Sign Fund is classified as one of the City's Special Revenue Funds. As such, the Sign Fund is used to account for proceeds from specific revenue sources and is legally restricted to expenditures for specific purposes. In contrast, the City's General Fund derives its revenue from ad valorem and sales taxes and pays for services provided to the general public such as police and fire protection.

In its findings of fact, the trial court found no direct relationship between the payment of fees for off-premise operating permits and receipt of services. The trial court also found that by charging the Sign Fund for loans from the General Fund and for the costs of litigation of sign issues, the City forced appellees to subsidize these costs for the benefit of the general public.

The Deloitte Study identified certain non-revenue producing activities performed by the Sign Administration, but it did not, according to Derek, analyze allocation of the costs of those activities. Notwithstanding the Deloitte findings, appellees' expert, Cooper, concluded that the $179.00 average fee set by Ordinance No. 89-767, had no direct relationship to the $19.73 cost found in the Deloitte Study, and therefore, was inconsistent with the "user fee" methodology utilized in that study. He also concluded that the ordinance was nothing more than a general revenue raising measure because the fees set therein merely subsidized, at appellees' expense, the cost of services provided primarily to on-premise sign owners and operators and the general public. Cooper testified that because these non-revenue producing activities did not benefit appellees, it was improper to charge appellees for any of the costs of those activities.

Cooper described in some detail how these non-revenue producing activities did not benefit appellees and how the allocation of those costs to the cost of an off-premise operating permit was inconsistent with the methodolo-

gy of the Deloitte Study and amounted to "general revenue raising." Cooper testified that because these activities provided little benefit to appellees, some or all them should have been performed by other City departments or eliminated altogether. Cooper also testified that these activities primarily benefitted the general public and should have been supported out of the General Fund. Cooper further testified that it was improper to charge the Sign Fund for the indirect departmental costs associated with the repayment of loans and payment of legal costs, which Cooper asserted and the trial court found, were the result of the Sign Administration's own inefficiency and mistakes. Finally, documents from a City Councilmember and from private business interests which were admitted into evidence suggested that the billboard industry was politically unpopular and that off-premise operating permit fees were increased to eliminate the industry. Certainly, those documents, the Deloitte findings, and Cooper's cost analysis was "some evidence" that there was no direct relationship between the fees for off-premise operating permits and the receipt of services. The City, however, also contended that the evidence was factually insufficient to support that finding.

The City's witnesses, including Derek, former Sign Administrator, Ronald Hudson, and former Sign Administration manager, Richard Smith, testified that it was proper to charge appellees for the costs of the Sign Administration's non-revenue producing activities simply because the Sign Administration was authorized by the Sign Code to perform those activities. The City's witnesses acknowledged that the non-revenue producing activities benefit the public, but that "the public" includes sign owners who benefit from the "level playing field" created as a result of those activities. Concerning the allocation of indirect departmental costs, the City's witnesses stated only that those costs were properly passed on to appellees. Specifically, Derek testified that the concept of "all costs reasonably borne" recited in the Deloitte Study pertained to the allocation of direct and indirect costs to sign owners and operators, not to whether costs were reasonably borne by a particular payor of fees; in

this case, billboard owners and operators. Former budget director for Public Works, John Baldwin, testified that revenue from fees was not diverted to other departments or to pay indirect costs, but was applied to cover the daily operating expenses of the Sign Administration. Finally, Ronald Hudson, who was responsible for pushing Ordinance No. 89–767 through City Council, denied that there was any consideration of raising permit fees beyond a party's ability to pay or to drive a particular party out of business.

 The trial court, as the sole trier of fact, is free to resolve any conflicts or inconsistencies in the evidence. *See McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex. 1986). Here, the trial court, based upon the evidence, could reasonably have concluded that there was no direct relationship between the payment of fees for an off-premise operating permits and the receipt of services and that such fees were not reasonably necessary to cover the costs of regulation, but were intended solely to raise revenue. *See also City of Ft. Worth,* 83 S.W.2d at 618.

## Inefficiency, Waste, and Mismanagement

To further illustrate that fees for off-premise operating permits were excessive and merely to raise revenue, appellees presented several examples of the Sign Administration's inefficiency, waste, and mismanagement. Indeed, the trial court found that the Sign Administration was characterized by waste, mismanagement, and inefficiency. Appellees offered the following examples, many of which are incorporated in the trial court's findings of fact:

(1) despite having regulatory responsibilities similar to that of the Sign Administration, the Building Inspection Division, which regulated signs before enactment of the Sign Code, never borrowed money, used fewer employees, and generally, incurred less costs and charged less for permit fees;

(2) since 1988, the Sign Administration has borrowed $725,000.00 from the General Fund to cover operating costs and still owes the General Fund $425,000.00, plus

interest, all of which was charged to the Sign Fund;

(3) the $576,411.90 settlement in *City of Houston v. De Trapani*, 771 S.W.2d 703 (Tex.App.—Houston [14th Dist.] 1989, no writ), plus $152,326.25 in attorney's fees from that and other cases were charged to the Sign Fund, which has yet reimburse the General Fund for payment of the settlement;

(4) the Sign Administration paid $5000.00 a month in rent for non-City owned office space;

(5) the City vehicles used by the Sign Administration had a high down-time;

(6) the Sign Administration was required to use the City garage, which "did not do a very good job, was incredibly slow, and charged high prices;"

(7) maintenance and repair problems were aggravated by an "unacceptable" absentee rate among Sign Administration employees and by the fact that the Sign Administration assigned City vehicles to those employees for home storage even though vehicle allowances was the preferred method of reimbursement under City policy;

(8) prior to the Deloitte Study, the City commissioned outside contractors to survey off-premise signs in the ETJ and to analyze city-wide costs, but neither study was used by the Sign Administration;

(9) budget shortfalls in the Sign Administration were due in part to the tri-annual renewal period and, though this problem was first recognized in 1983, the renewal period was not changed until 1989;

(10) despite budget shortfalls, the Sign Administration, with the passage of the 1989 ordinance, eliminated the on-premise permit fee for electrically, illuminated wall signs less than 100 square feet, resulting in a loss of revenue of approximately $90,000 per year; and

(11) Sign Administration staffing levels were well below that projected in its 1989 fee proposal and have been below the levels authorized by City Council each fiscal year.

Much of the evidence regarding the Sign Administration's budget problems and ineffi-ciency was elicited from the City's witnesses during questioning by appellees' counsel. While the City offered some testimony on cross-examination and in the presentation of its case to explain or justify the Sign Administration's budget problems and inefficiency, much of that evidence was not directly rebutted by the City. Hence, there was sufficient evidence to support the trial court's findings that the Sign Administration was characterized by waste, mismanagement, and inefficiency. Based upon the evidence, the trial court could reasonably have concluded that the fees charged by the City's Sign Administration for off-premise operating permits were excessive and merely to raise revenue.

Having thoroughly reviewed the record in this case, we find sufficient evidence to support the trial court's findings that there was no direct relationship between the payment of fees for off-premise operating permits and the receipt of services. We further hold that the trial court properly concluded that the revenue generated by the City's fees for off-premise operating permits exceeded the reasonable cost of regulation and that such fees constituted an impermissible occupation tax. The City's first point of error is overruled.

In its second point of error, the City contends that the trial court erred in concluding that the fees for off-premise operating permits violated appellees' rights under the U.S. Constitution and consequently, that the City was liable under 42 U.S.C. § 1983.

■■■ The fact that appellees were assessed an unlawful occupation tax in violation of the State Constitution does not by itself constitute a compensable injury under section 1983. *See City of Grand Prairie v. Sisters of the Holy Family of Nazareth*, 868 S.W.2d 835, 843 (Tex.App.—Dallas 1993, writ denied). To recover damages under section 1983, appellees were required to prove that they were deprived of a right or privilege secured by the Constitution or laws of the United States. 42 U.S.C. § 1983 (1981). There is no dispute that the City is a proper defendant under section 1983. *See id.* at 842 n. 3 (citing *City of Arlington v. Byrd*, 713 S.W.2d 224, 228 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3213, 96 L.Ed.2d 700 (1987)).

In the instant case, appellees alleged, and the trial court found, that the City committed multiple constitutional violations, including violations of free speech, procedural and substantive due process, and equal protection. U.S. CONST. amends. I, V, XIV. Proof of any one of those constitutional violations, standing alone, was sufficient to allow appellees to recover under section 1983. *See* 42 U.S.C. § 1983.

■■■ The trial court found that the City violated appellees' right to due process under the Fourteenth Amendment to the U.S. Constitution "by failing to refund the portion of off-premise operating permit fees paid under duress that have been determined to be unconstitutionally excessive." In *McKesson v. Div. of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 31, 110 S.Ct. 2238, 2247, 110 L.Ed.2d 17 (1990), the U.S. Supreme Court held that "if a State places a taxpayer under duress to promptly pay a tax when due and relegates him to a post-payment refund action in which he can challenge the tax's legality, the Due Process Clause of the Fourteenth Amendment obligates the state to provide meaningful backward-looking relief to rectify any unconstitutional deprivation." *McKesson* involved a wholesale liquor distributor who challenged Florida's excise liquor tax scheme on grounds that it violated the Commerce Clause of the U.S. Constitution by providing special tax rate reductions which favored distributors of local products. 496 U.S. at 20–26, 110 S.Ct. 2242–44.

The Florida Supreme Court agreed and enjoined the State from giving future effect to those preferential rate reductions thereby leaving all distributors subject to the same non-preferred rate. *Id.* at 25, 110 S.Ct. at 2244. The court, however, refused to order a refund in the amount of excess taxes paid by the distributor as a result of its disfavored treatment or to provide the distributor with any other form of relief for the taxes previously paid. *Id.* The U.S. Supreme Court observed that while the government's strong interest in financial stability does not require a State to provide a pre-deprivation process for challenging an exaction of taxes, a State must, to satisfy the minimum requirements

of the Due Process Clause, provide a meaningful post-deprivation process. *Id.* at 36–39, 110 S.Ct. at 2250–51. Further, in rejecting the State's equitable arguments in support of granting only a prospective remedy of non-preferential treatment, the court explained that a State "must provide taxpayers not only a fair opportunity to challenge the accuracy and legal validity of their tax obligation, but also a 'clear and certain remedy' for any erroneous or unlawful tax collection to ensure that the opportunity to contest the tax is a meaningful one." *Id.* at 39, 110 S.Ct. at 2251. Finally, the court noted that a "clear and certain" remedy could include a refund of the excess tax paid, an assessment against competitors who previously benefitted from the preferential tax rate, or a combination of both. *Id.* at 39, 110 S.Ct. at 2252.

■■■ Thus, in the instant case, it was incumbent on appellees to show that they were without a meaningful opportunity to contest the validity of the tax assessed. *See Grand Prairie*, 868 S.W.2d at 845–46. Appellees were subject to financial sanctions for non-payment or late payment of off-premise operating permit fees. *See* HOUSTON, TEX., SIGN CODE ch. 46, §§ 4604(d), 4605(d), (i). It was undisputed that appellees paid those fees under protest and under duress. *See McKesson*, 496 U.S. at 39, n. 21, 110 S.Ct. at 2251, n. 21. As we have discussed, those fees were correctly found by the trial court to be excessive and in the nature of an unlawful occupation tax. The Due Process Clause applies to any *unlawful collection* of taxes, including one that violates state law or provisions of the state Constitution. *See Smith v. Travis County Educ. Dist.*, 791 F.Supp. 1170, 1178 n. 5 (W.D.Tex.), *vacated on other grounds*, 968 F.2d 453 (5th Cir.1992). [emphasis in original] Despite the fact that appellees were required under threat of penalty to timely pay such a tax, there was neither a pre-deprivation nor post-deprivation procedure available for appellees to challenge the validity of that tax or to obtain "clear and certain" relief; in this case, refund of the excess tax paid.[2]

---

2. There is no dispute that only a refund provides appellees with "clear and certain" relief.

Appellees' only course of action was to file this suit. *See Grand Prairie,* 868 S.W.2d at 846 (holding that section 1983 action is necessary to determine whether pre-deprivation procedure provided by State law is adequate to preserve taxpayer's right to due process of law).[3] By depriving appellees of their property without allowing them the opportunity to challenge that deprivation and to obtain relief, the City violated appellees' right to procedural due process under the Fourteenth Amendment to the U.S. Constitution. Thus, the trial court's finding was proper. Because this violation alone entitled appellees to recover under section 1983, we need not address whether the trial court correctly found other constitutional violations.[4] The City's second point of error is overruled.

■ In its third and fourth points of error, the City contends that the evidence is legally and factually insufficient to support the trial court's finding of $40.00 as a reasonable fee and that the trial court erred in "relating such a reasonable fee back to periods for which there is insufficient evidence to establish a reasonable fee."

The trial court found that "$40.00 represents the charge for recouping the reasonable costs of regulation for an off-premise operating permit, [and that] all sums levied in excess thereof are general revenue raising measures and an occupation tax." We are aware, as the City points out, that there is nothing in the record to show how the trial court arrived at the $40.00 figure. Indeed, the City's argument essentially is that the figure is without foundation in the record. We disagree.

■ While our review is of the sufficiency of the evidence under the standard previously stated, we note that the trier of fact has the discretion to award damages within the range of the evidence presented at trial. *See Neiman Marcus Group, Inc. v. Dworkin,* 919 F.2d 368, 372 (5th Cir.1990); *see also Insurance Co. of North Am. v. Cangelosi,* 217 S.W.2d 888, 890 (Tex.Civ.App.—Waco 1949, no writ). Here, evidence was admitted without objection of fees set by City Council dating back before 1980 and of the average fee paid by appellees dating back to 1983. More importantly, evidence was presented to the court that a reasonable fee for a three-year, off-premise operating permit, based upon each party's differing assessment of the costs to be included in that fee, was as high as $179.00 and as low as $14.74. Obviously, the court was given wide parameters within which it could exercise its discretion in arriving at a reasonable fee. That fact alone, however, does not mean that the court's determination of $40.00 as a reasonable fee was arbitrary.

In *Dworkin,* an employee sued his employer for breach of an employment contract. 919 F.2d at 369. There was a question of

3. Section 4604(e) of the Sign Code provides that "any person wishing to appeal a decision of the Sign Administrator on the grounds that the decision *misconstrues or wrongly interprets* this chapter" may do so. [emphasis added] Although exhaustion of an administrative remedy is not a prerequisite to an action under section 1983, the above provision of the Sign Code plainly does not provide a remedy for an invalid assessment of fees. *See Patsy v. Florida Board of Regents,* 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982). Our conclusion is consistent with the testimony of former HCOAA President, Rob Schmerler, that fee disputes between appellees and the Sign Administration were never the subject of appeals under the Sign Code.

4. In *Soldal v. Cook County, Illinois,* — U.S. —, —, 113 S.Ct. 538, 542, 121 L.Ed.2d 450 (1992), the plaintiff brought suit under section 1983, alleging violations of both the Fourth and Fourteenth Amendments to the U.S. Constitu-

tion. The Seventh Circuit had previously held that no "seizure" within the meaning of the Fourth Amendment had occurred. — U.S. at —, 113 S.Ct. at 542. The lower court also had held that even if a "seizure" had occurred, the plaintiff's claim implicated only procedural due process rights; a ground not raised by the plaintiff. *Id.* at —, n. 5, 113 S.Ct. at 542 n. 5. The U.S. Supreme Court stated that where multiple constitutional violations are alleged, courts should not as a preliminary matter attempt to identify the claim's "dominant character," but should examine each constitutional provision in turn. *Id.* at —, 113 S.Ct. at 548. However, *Soldal* is inapposite, not only because it involved an attempt by the lower court to re-characterize the plaintiff's claim, but also because it involved the denial of relief by that court. *Id.* at — n. 5, 113 S.Ct. at 542 n. 5. Here, we grant relief. Furthermore, our disposition of this point of error should not in any way be construed as giving importance to one constitutional right over another.

whether the employee's net earnings from his new employer were equal to, or exceeded, his earnings from his former employer thus, barring his recovery of lost compensation. *Id.* at 372. The jury heard evidence that the employee would have received $1.8 million in base salary and non-salary benefits from his old employer as compared to the base salary of $760,000.00 he actually received from his new employer. *Id.* at 373. The difference exceeded $1 million, but the jury awarded the employee $750,000. *Id.* Although the former employer disputed the employee's entitlement to, and valuation of, non-salary benefits, the court held that there was sufficient evidence for the jury to assign a reasonable value to the employee's lost compensation and that the jury's award fell within the range of reasonableness established by the evidence. *Id.* at 374.

Similarly, *Cangelosi* involved a suit on an insurance policy to recover for the loss of bales of hay destroyed in a barn fire. *Id.* at 888. In determining the number of bales lost in the fire, the jury heard conflicting testimony on the dimensions of the barn and on the average size of a bale of hay. *Id.* at 889–90. The jury also heard testimony that the barn at one time stored 4,000 bales. *Id.* at 890. Based upon the testimony of all the witnesses, the barn could have held anywhere from 931 to 10,000 bales of hay. *Id.* The jury's finding that the barn held approximately 4000 bales at the time of the fire was upheld by the appellate court because it was within the range of evidence presented. *Id.*

In the instant case, appellees put on evidence that they paid over $1.9 million in excessive off-premise operating permit fees between 1983 and 1992. Based upon that evidence, most notably, plaintiffs' exhibit number 11, and upon the testimony of their expert, appellees calculated that $114.45 was the average permit fee paid during that time. Appellees subtracted $14.74, the permit fee which they contended was reasonable, from $114.45, resulting in a difference or overpayment of $99.61 per permit. Appellees then multiplied 19,918, the total number of permits purchased between 1983 and 1992, times $99.61 for a product of $1,984,031.96. The City did not dispute this calculation or offer any of its own figures or calculations.

As described in the court's judgment, it appears that the trial court attempted the same calculation, except that its figures go back only to 1985 and it included $40.00 as the reasonable fee per permit. The trial court found that appellees paid over $1.4 million in excessive permit fees. That figure was less than what appellees claimed. We cannot say that the trial court's findings went beyond the bounds of reasonableness established by the evidence or that they exceeded the range of evidence presented at trial. *See Dworkin,* 919 F.2d at 374; *Cangelosi,* 217 S.W.2d at 890.[5] We hold that the evidence is sufficient to support the trial court's finding of $40.00 as a reasonable, off-premise operating permit fee. The City's third and fourth points of error are overruled.

In its fifth point of error, the City contends that the trial court erred in not limiting damages to the period of two years preceding the filing of appellees' First Amended Petition. Alternatively, the City

5. We are aware of the holding in *First State Bank v. Keilman,* 851 S.W.2d 914, 930–31 (Tex.App.—Austin 1993, writ denied), in which the court found insufficient evidence to support the jury's finding of unauthorized interest based upon the Keilmans' counterclaim of usury. In that case, the Keilmans claimed $7,161.44 in unauthorized interest while the bank claimed that no unauthorized interest was charged. 851 S.W.2d at 931. While noting that both parties provided a "relatively precise" method for calculating unauthorized interest, the court concluded that the jury's finding of $360.00 in unauthorized interest was inexplicable in light of the evidence presented at trial and that there was no rational basis for the jury's calculation. *Id.* The instant case is distinguishable on two counts. First, there was a rational basis for the court's calculation of damages in this case insofar as it was based upon the same calculation set forth in the record by appellees without objection by the City. Second, there was no precise method for calculating a "reasonable" fee. As we stated, the "reasonableness" of the fee turned upon the determination of the costs properly chargeable to appellees. While both parties presented evidence on that issue, neither side set out a method for the trial court to follow in calculating a fee and no such calculation by the court appears in the record. Nonetheless, the trial court could have concluded, consistent with the evidence and its findings, that certain costs could reasonably be charged to appellees in the cost of an off-premise operating permit fee.

contends that appellees should be limited to damages incurred since the May 24, 1989, the date of passage of Ordinance No. 89–767.

The trial court's calculation of damages in its findings of fact and the award of damages included in the Final Judgment date back to 1985. As we noted, appellees filed their Original Petition on January 9, 1987, and after the passage of Ordinance No. 89–767, amended that petition on July 14, 1989. At trial, the City argued that the amended pleading was "wholly based on a new, distinct or different transaction or occurrence" and thus, did not relate back to the Original Petition for the purpose of calculating damages for the two years preceding the filing of that pleading. *See* TEX.CIV.PRAC. & REM. CODE ANN. § 16.068 (Vernon 1986). The City never asserted that appellees' cause of action was barred.

The trial court, in its conclusions of law, determined that appellees' First Amended Petition did relate back to the Original Petition for the purpose of calculating damages. However, we need not address whether appellees could recover damages dating back to 1985 because that issue was tried by consent. At the close of evidence, counsel for appellees moved for a trial amendment, pointing out to the court that evidence of damages dating back to 1985 was admitted without objection by the City attorney. Counsel's motion was unopposed by the City and the court granted the trial amendment. We hold that the granting of the trial amendment is dispositive of the City's claim that damages should not have been calculated back to 1985. *See* TEX.R.CIV.P. 66, 67. The City's fifth point of error is overruled.

In its sixth point of error, the City contends that the trial court erred in awarding attorney's fees "because it erroneously concluded that appellees should prevail on their constitutional claims."

The trial court concluded that appellees were entitled to recover attorney's fees "in prosecuting their civil rights claims against [the City], pursuant to section 1988 of the Civil Rights Act." As we stated, the court's Final Judgment awarded appellees both trial and conditional appellate attorney's fees. The City's only argument is that appellees

should not be allowed to recover any attorney's fees because they should not have prevailed under section 1983. The City concedes, however, that section 1988 gives the court discretion to award reasonable attorney's fees incurred at trial or on appeal by a party who prevails in a section 1983 action. 42 U.S.C. § 1988(b) (Supp.1994); *Grand Prairie,* 868 S.W.2d at 847; *Tasby v. Wright,* 550 F.Supp. 262, 269–70 (N.D.Tex.1982). Because the trial court correctly found that the City charged appellees an unlawful occupation tax in violation of appellees' right to procedural due process and that appellees were entitled to recovery under section 1983, the trial court properly awarded trial and appellate attorney's fees to appellees. The City's sixth point of error is overruled and the trial court's judgment is affirmed.