

OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS

JOHN CORNYN

November 16, 1999

The Honorable Bob Turner
Chair, Committee on Public Safety
Texas House of Representatives
P.O. Box 2910
Austin, Texas 78768-2910

Opinion No. JC-0145

Re: Authority of a municipality to regulate or prohibit street vendors (RQ-0070-JC)

Dear Representative Turner:

On behalf of the City of Camp Wood, you request an opinion from this office with respect to a city's authority to regulate or prohibit street vendors. You inform us that the city desires a ruling on the legality of a city ordinance on vendor permits, and you specifically ask us the following questions:

> Is it legal for a city to pass a city ordinance that restricts street vendors from selling in a city without a permit? If not, what restrictions can they impose?
>
> May a city pass a city ordinance that requires a vendor to construct a permanent building with restrooms and parking?
>
> May a city impose the above restrictions on a street vendor if he or she is state licensed and has a state tax number?
>
> May a city pass a city ordinance that restricts a vendor from selling on private property?

Letter from Honorable Bob Turner, Chair, Committee on Public Safety, Texas House of Representatives, to Elizabeth Robinson, Office of the Attorney General (May 20, 1999) (on file with Opinion Committee) [hereinafter "Request Letter"]. You state: "Basically, I would like an opinion . . . as to what a city can do in regards to vendors on public and private property." *Id.* We limit our discussion and answers in this opinion to the general law relating to itinerant vendor regulation insofar as a Type A general-law city is concerned, keeping in mind the issues with which your questions apparently are concerned. We cannot in the opinion process determine the legality of any city ordinance regulating street vending or of any particular restriction on street vending.

## Municipal Authority

The scope of a city's authority in general is determined by its organization as a home-rule city or a general-law city. Unlike a home-rule city that possesses all powers not denied to it by statutes or the constitution so long as the city has incorporated those powers in its home-rule charter, a general-law city possesses only those powers expressly given to it by statutes or those necessarily implied therefrom. *See* Tex. Att'y Gen. Op. No. JM-169 (1984) at 1-2; Tex. Att'y Gen. LO-90-14, at 1. The City of Camp Wood, we understand, is a Type A general-law city.[1]

A Type A city has the general authority to prohibit or regulate the sale of all or certain merchandise on all or certain parts of its city streets and sidewalks by ordinance based on its statutory authority to pass ordinances or police regulations, control streets and public places, and prohibit or regulate hawkers and peddlers. Section 51.001(1) of the Local Government Code, applicable to all cities, authorizes a city to adopt an ordinance, rule, or police regulation that is for good government, peace, or order of the municipality or for the trade and commerce of the municipality. *See* TEX. LOC. GOV'T CODE ANN. § 51.001(1) (Vernon 1999). Section 215.028 of the Local Government Code specifically authorizes a Type A city to designate and regulate market places, *see id.* § 215.028, and section 215.031 authorizes such a city to license, suppress, prevent, or otherwise regulate hawkers, peddlers, and pawnbrokers, *see id.* § 215.031. Further, section 311.002 of the Transportation Code gives all general-law cities exclusive control over their streets and alleys. *See* TEX. TRANSP. CODE ANN. § 311.002 (Vernon 1999).

A Type A city may not prohibit the occupation or business of street vending, but it may, in general, prohibit or reasonably regulate by ordinance the sale of merchandise on its city streets and other public places by itinerant vendors. Under its statutory powers to pass ordinances and police regulations for good government, control streets and public grounds, and to control and regulate market places and hawkers and peddlers, in *Ex parte Hogg*, 156 S.W. 931 (Tex. Crim. App. 1913), the Court of Criminal Appeals held that the City of Weatherford could pass an ordinance prohibiting peddlers from selling articles in all or a portion of the city's public streets and squares. *See Hogg*, 156 S.W. at 932-33. Significantly, the court emphasized that the ordinance did not prohibit persons from following the occupation of peddling, but simply denied them the right to follow that occupation in the public streets and squares of the city. *See id.* at 933. Furthermore, the court said the ordinance did not discriminate against peddlers, but merely classified peddlers in a different category than other merchants, "which is perfectly proper and legitimate." *Id.* A long line of Texas cases have followed *Hogg. See, e.g., Ex parte Killam*, 162 S.W.2d 426 (Tex. Crim. App. 1942); *City of Waco v. O'Neal*, 33 S.W.2d 205 (Tex. Civ. App.–Waco 1930, writ ref'd) (upholding City of Waco's ordinance prohibiting barter and sale of farm products based on city's statutory and special

---

[1]Telephone Conversation with Honorable Jim Blakeney, Mayor, City of Camp Wood (Aug. 22, 1999). A Type A general-law municipality is one that has incorporated as a Type A under subchapter A of chapter 6 of the Local Government Code, has changed to a Type A under subchapter B of chapter 6, or operated under chapters 1 through 10 of title 28 of the Revised Civil Statutes immediately preceding September 1, 1987. *See* TEX. LOC. GOV'T CODE ANN. § 5.001 (Vernon 1999).

charter powers to control its city streets and other public property) (and cases cited therein); *see also* Annotation, *Authorization, Prohibition, or Regulation by Municipality of the Sale of Merchandise on Streets or Highways, or Their Use for Such Purpose* 14 A.L.R. 3D 896, 908-09 (1967) (discussing Texas cases).

You ask whether a Type A city may pass an ordinance that (1) requires a vendor to construct a permanent building with restrooms and parking and (2) that restricts a vendor from selling on private property. *See* Request Letter, *supra*, at 1. First, we conclude that a city may not require street vendors to construct permanent buildings with restrooms and parking facilities because that would be, in our opinion, tantamount to prohibiting the occupation of street vending. Second, to the extent you ask whether a city may generally restrict the sale of goods on private property, we conclude in the negative given that a city's authority to regulate itinerant vendors extends to city streets and other public places, excluding, by definition, private property.

We note that because of the particular items sold or the particular area involved, a city under its zoning authority might be able to require that the items be sold in a permanent structure or restrict sales from private property. *See, e.g.*, TEX. LOC. GOV'T CODE ANN. §§ 211.003(a)(5) (Vernon 1999) (city may regulate location and use of buildings, other structures, and land for business, industrial, residential, or other purposes); 211.005 (governing body may divide city into districts and regulate construction and use of buildings, other structures, or land). A city might also be able to restrict sales from private property under its authority to abate nuisances. *See id.* § 217.002 (Type A city's authority to abate nuisance). We do not, however, understand you to ask about particular sales or regulating in particular areas.

## Licensing Authority

You also ask whether a Type A general-law city may pass an ordinance that restricts street vendors from selling in a city without a permit.[2] We conclude in the affirmative.

A Type A city has the authority to require vendors to obtain a license as a condition to selling merchandise on its city streets. It is expressly authorized to license, tax, suppress, prevent, or otherwise regulate hawkers and peddlers. *Id.* § 215.031(1), (2). *But see Houston Credit Sales Co. v. City of Trinity*, 269 S.W.2d 579, 581 (Tex. Civ. App.–Waco 1954, writ ref'd n.r.e.) (questioning whether "hawkers and peddlers" includes itinerant vendors, specifically door-to-door salesmen of household goods). The city's governing body may direct the manner of issuing a license and set the fees to be paid for the licenses, but the license may not be for more than a year. *See* TEX. LOC. GOV'T CODE ANN. § 215.033 (Vernon 1999); *see also* TEX. TAX CODE ANN. § 302.101(b) (Vernon 1992) (license required by Type A city may not extend to more than one establishment or apply to more than one occupation, business, or calling).

---

[2]The terms "license" and "permit" are essentially the same, although legally "license" ordinarily refers to the privilege of conducting a continuing activity while "permit" ordinarily refers to an activity of limited duration on whose completion the privilege expires. *See Johnson v. City of Austin*, 674 S.W.2d 894, 897 (Tex. App.–Austin 1984, no writ).

Although you do not ask, we understand that the City of Camp Wood is concerned about the amount it may charge for a vendor permit.[3] A city may charge an amount reasonably necessary to cover its administrative and regulatory costs or reasonably related to its legitimate licensing objective. *See* TEX. LOC. GOV'T CODE ANN. § 215.033 (Vernon 1999); *Houston v. Harris County Outdoor Adver. Ass'n*, 879 S.W.2d 322, 326-27 (Tex. App.–Houston [14th Dist.] 1994, writ denied); *Houston Credit Sales*, 269 S.W.2d at 581.

A Type A general-law city may charge a reasonable license fee for the primary purpose of regulation. *See Harris County Outdoor Adver.*, 879 S.W.2d at 326 (if primary purpose of exaction is regulation, then it is a license fee). A reasonable license fee *"cannot be excessive nor more than reasonably necessary to cover the cost of granting the license and of exercising proper police regulation, or it must bear some reasonable relationship to the legitimate object of the licensing ordinance." Id.* at 326-27 (emphasis in original); *see also Johnson v. City of Austin*, 674 S.W.2d 894, 897 (Tex. App.–Austin 1984, no writ) ("A 'license' has the purpose of regulation under the police power.").

The authority under section 215.031 to suppress or prevent hawkers and peddlers does not allow a city to charge fees that are so excessive as to preclude an itinerant vendor from engaging in that occupation, although what is excessive depends on the particular facts and circumstances. For instance, in *Houston Credit Sales*, the court concluded that an annual "licensing" vendor fee of $1200, irrespective of whether characterized as a tax or license fee, was so large and excessive as to render the ordinance imposing it invalid. "[S]uch oppressive exaction by a town of less than 2,500 population," the court said, "is manifestly prohibitive and confiscatory in its application to the business of appellants." *Houston Credit Sales*, 269 S.W.2d at 581. The trial court had found that the vendor — a door-to-door salesperson of household goods — collected approximately $22 per week in the city. The court rejected the city's argument that because the city had the statutory power, under the predecessor provision to section 215.031, to prohibit the activity of peddling and hawking, it had the power to do anything less than that in the way of regulation. *See id.*

Notwithstanding the section 215.031 authority to license, *tax*, suppress, prevent, or otherwise regulate hawkers and peddlers, a city is not authorized to levy an occupation tax on street vendors, given that the state does not levy such tax. *See* TEX. CONST. art. VIII, § 1(f) (implicitly prohibiting city from levying occupation tax where no such tax is levied by state); *Ex parte Stevenson*, 169 S.W.2d 175 (Tex. Crim. App. 1943) (invalidating city ordinance levying city occupation tax given 1931 repeal of state occupation tax on foot peddlers). In contrast to license fees, an occupation tax is designed primarily to raise revenues. *See Harris County Outdoor Adver.*, 879 S.W.2d at 326 (if primary purpose of exaction to raise revenue, then it is occupation tax).

---

[3]Telephone Conversation with Honorable Jim Blakeney, Mayor, City of Camp Wood (Aug. 22, 1999).

## Going on Private Property

You next ask whether a Type A general-law city may pass an ordinance that restricts a vendor from selling on private property. To the extent your question concerns vendors going to private residences to sell goods, we conclude that a city may regulate but not prohibit such activity.

Again, notwithstanding the broad statutory authority to "license, tax, suppress, prevent, or otherwise regulate hawkers and peddlers" discussed above, a city may *regulate* but not *prohibit* the going in and on private property by persons to sell merchandise. *See Ex parte Luehr*, 266 S.W.2d 375 (Tex. Crim. App. 1954); *Ex parte Faulkner*, 158 S.W.2d 525 (Tex. Crim. App. 1942); *Houston Credit Sales*, 269 S.W.2d 579. In other words, a city may impose conditions, selectively restrict, or prohibit certain solicitations based on considerations related to the city's regulatory objective; it cannot simply prohibit all such solicitations regardless of such considerations. *See Faulkner*, 158 S.W.2d at 527.

In *Faulkner*, the court, while acknowledging a city's power to prohibit hawkers and peddlers, and solicitors on its city streets and other public places, invalidated as going beyond that authority an ordinance prohibiting any uninvited person from going in and upon private residences to solicit the sale of goods or sell any goods as a nuisance. *See id.* at 526-27. The court questioned that a city could justifiably determine that all goods presented or sold in this manner should not be so sold or are always a nuisance. Although the court did not expressly delineate what it meant by "regulation" and "prohibition," its statement regarding a city's appropriate authority is telling:

> It is sufficient that the municipality be given the power to establish an available agency with facilities for looking into the merits of all goods to be sold and the responsibility and methods of the parties selling them, and, therefore, be able to say whether or not they should be permitted to operate within the bounds of such municipality.

*Id.* at 527; *see also Luehr*, 266 S.W.2d at 377 (city without authority to prohibit solicitors going in and on private residences without regard to goods sold and responsibility and method of parties). The *Faulkner* court concluded that although the legislature has delegated to a municipality the authority to regulate, "we are . . . unable to find that our legislature has, or may, delegate to the municipality the right to prohibit solicitors from going in and upon private property for the purpose of selling their wares." *Faulkner*, 158 S.W.2d at 527. The *Faulkner* court did not discuss the predecessor to section 215.031 of the Local Government Code. But the court in *Houston Credit Sales*, following *Faulkner*, specifically stated that a city could regulate but not prohibit the going in and upon private residences notwithstanding the statutory authority to "license, tax and regulate or suppress and prevent hawkers, peddlers." *Houston Credit Sales*, 269 S.W.2d at 581.

## State Law Preemption

Lastly, you ask whether a Type A general-law city may impose restrictions on a street vendor if he or she is state licensed and has a state tax number. We conclude that it depends on the authorizing or licensing state statute.

A city may not adopt an ordinance regulating a business activity that is in conflict with a state statute. *See Dallas Merchant's & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 491 (Tex. 1993) (city ordinance that attempts to regulate subject matter preempted by state statute is unenforceable to extent it conflicts with statute); *Utter v. State*, 571 S.W.2d 934, 936 (Tex. Crim. App. [Panel Op.] 1978) (generally discussing cases dealing with city's authority to regulate and license buses, taxis, taxi drivers, or ambulances also regulated or licensed by state). Thus, when a state statute provides that a person holding an operator's, commercial operator's, or chauffeur's license from the state shall not be required to obtain any other license to operate a motor vehicle, a city may not license those drivers. *See Reed v. City of Waco*, 223 S.W.2d 247 (Tex. Civ. App.–Waco 1949, writ ref'd); *City of Corpus Christi v. Gilley*, 458 S.W.2d 124 (Tex. Civ. App.–Corpus Christi 1970, writ ref'd n.r.e.).

No statute specifically authorizes or licenses "street vending." But, if the state has authorized or licensed a particular occupation or activity that is the subject of street vending, a city might be precluded from requiring a permit as a condition of engaging in that activity within the city. *See Combined Am. Ins. Co. v. City of Hillsboro*, 421 S.W.2d 488 (Tex. Civ. App.–Waco 1967, writ ref'd n.r.e.). For instance, in *Combined American Insurance*, the court held invalid an ordinance as it related to insurance sales by a state licensed insurance company and its state licensed salesmen prohibiting any person from going house-to-house or from place-to-place in the city to sell goods unless the person had obtained a license from the city and paid the required license fees. *See Combined Am. Ins.*, 421 S.W.2d at 491. The court stated that the insurance company had complied with the relevant state insurance licensing laws, had been issued a certificate of authority from the State Board of Insurance evidencing such compliance, and that the company was accordingly "authorized to transact the business of life, health and accident insurance in the State of Texas, and that the City of Hillsboro . . . [is] without authority to interfere with it in the soliciting of its business." *Id.*

Although you do not specify, the City of Camp Wood is apparently concerned that it may be precluded from licensing street vendors who have a sales tax permit from the state.[4] A person engaged in the business of making sales of taxable items subject to the sales and use tax under chapter 151 of the Tax Code must obtain a permit from the Comptroller of Public Accounts for each place of business in the state. *See* TEX. TAX CODE ANN. §§ 151.008 (Vernon 1992) (defining "Seller" and "Retailer"); 151.201 (issuance of sales tax permits); 151.202 (application for permit). This permit simply allows the seller to collect the sales tax on the items sold, which is required to be remitted to the Comptroller. *See, e.g., id.* §§ 151.052 (collection by seller of tax as part of sale

---

[4]*See supra* note 3.

price), 151.251 (applicant for permit must file adequate security for taxes due); *id.* § 151.401 (Vernon Supp. 1999) (taxes imposed payable to Comptroller).

The sales tax permit provisions do not license or authorize street vending and, therefore, cannot present a conflict with a city ordinance regulating by permit such activity. *See Utter,* 571 S.W.2d at 936 (city's power to regulate by requiring permit for operation of wrecker not limited since no conflicting statute found); *see also City of Richardson v. Responsible Dog Owners,* 794 S.W.2d 17, 19 (Tex. 1990) ("[T]he mere fact that the legislature has enacted a law addressing a subject does not mean that the subject matter is completely preempted. When there is no conflict between a state law and a city ordinance, the ordinance is not void.").

In short, if the state has authorized or licensed a particular occupation or activity that is the subject of street vending, a city might be precluded from regulating that activity by requiring a permit as a condition of engaging in it within the city. Issuance of a sales tax permit to a vendor, however, is not such state authorization or license as to preclude a city from requiring the vendor to obtain a permit in order to sell in the city.

## Constitutional Limits

In addition to the parameters discussed above, a city's authority to adopt an ordinance regulating street vending is subject to state and federal constitutional constraints. We limit our discussion to those most commonly addressed by the courts in this context.

An ordinance regulating street vending must comport with the equal protection provisions of the state (article I, section 3) and federal (Equal Protection Clause of the Fourteenth Amendment) constitutions. It may, consistently with these provisions, reasonably classify persons according to their business and apply different rules to different classes — as long as persons in the same class are treated the same — to further legitimate purposes of the city. *See, e.g., City of New Orleans v. Dukes,* 427 U.S. 297 (1976); *Hixon v. State,* 523 S.W.2d 711 (Tex. Crim. App. 1975); *Rucker v. State,* 342 S.W.2d 325 (Tex. Crim. App. 1961); *Houston Chronicle Publ'g Co. v. City of Houston,* 620 S.W.2d 833, 838 (Tex. App.–Houston [14th Dist.] 1981, no writ). For example, in *City of New Orleans v. Dukes,* the United States Supreme Court upheld a City of New Orleans ordinance prohibiting all vendors from selling food from pushcarts in the French Quarter, except those that had "continuously operated the same business . . . for eight or more years prior to January 1, 1972," *Dukes,* 427 U.S. at 298, stating: "The city's classification rationally furthers the purpose which . . . the city had identified as its objective in enacting the provision, that is, as a means 'to preserve the appearance and custom valued by the Quarter's residents and attractive to tourists.'" *Id.* at 304 (citation omitted). Allowing the continued operation of some vendors, the Court continued, was not an arbitrary or irrational method of achieving the city's purpose because the city could rationally choose to initially eliminate only recent vendors rather than all vendors; reasonably determine that newer businesses were less likely to have built up substantial reliance on continued operation; and that the vendors excepted under the grandfather clause who had operated for over twenty years had themselves become part of the distinctive part of the charm of the French Quarter. *Id.* at 305; *see*

*also Hixon*, 523 S.W.2d 711(upholding city ordinance prohibiting sale of all merchandise on city streets except flowers and ice cream).

But an ordinance regulating street vending may not, as a general matter, impinge on fundamental personal rights or classify persons based on inherently suspect distinction such as race, religion, or alienage. *See Dukes*, 427 U.S. at 303. A different test is applied by the courts under the equal protection analysis when a regulatory ordinance's classification affects fundamental rights such as the rights of free speech and free press. If such rights are affected, the classification becomes suspect, and the city must show that the classification is necessary to promote a compelling interest. *See Houston Chronicle Publ'g Co.*, 620 S.W.2d at 838 (citing *Dunn v. Blumstein*, 405 U.S. 330 (1972)). For example, in *Houston Chronicle Publishing Co.* the court struck down an ordinance that prohibited the sale of newspapers to any occupant of a motor vehicle on a city street or other public place, but allowed such sales of frozen desserts and flowers. The court observed that the three classes of street vendors established by the ordinance — those selling flowers, those selling frozen desserts, and those selling newspapers — were similarly situated as sellers of merchandise on the city's streets and sidewalks. *See Houston Chronicle Publ'g Co.*, 620 S.W.2d at 838. The reasons offered by the city, the court concluded, for the differential treatment of newspaper vendors were insufficient to justify the selective exclusion of newspaper vendors from the city streets: "While traffic control and vendor safety are compelling interests, access to the street cannot be denied on those bases to those who would there exercise fundamental rights, yet allowed to those involved in purely commercial endeavors." *Id.*

Further, a regulatory ordinance affecting fundamental rights such as those of free speech or free press may violate the First Amendment of the United States or article I, section 8 of the Texas Constitution, as well as the due process clause of the Fourteenth Amendment of the United States or article I, section 19 of the Texas Constitution. If a regulation impinges on First and Fourteenth Amendment rights, the city must show the validity of its asserted interest *and* the absence of less intrusive alternatives to achieving that interest. *See id.* at 836-37. For instance, the court in *Houston Chronicle Publishing Co.* also invalidated the City of Houston ordinance prohibiting newspaper sales to motor vehicle occupants as violating those rights, stating: "The . . . ordinance is unreasonably restrictive. While the ends are permissible [preventing traffic hazard and congestion], [in] the means of achieving those ends the ordinance sweep[s] too broadly, unnecessarily invading appellant's protected freedom." *Id.* at 837.

Lastly, an ordinance regulating street vending may not interfere with interstate commerce. A regulatory ordinance violates the Commerce Clause of the federal constitution (article I, section 8) if it (1) affirmatively discriminates against out-of-state merchants, or (2) regulates evenhandedly but incidentally burdens interstate commerce and the burden is clearly excessive in relation to the local benefits. *See Hispanic Taco Vendors v. City of Pasco*, 994 F.2d 676, 678-79 (9th Cir. 1993). In *Hispanic Taco Vendors v. City of Pasco*, the court upheld a city ordinance that imposed licensing fees on street vendors, made the licenses nontransferable, banned sales from vacant lots, and imposed setback requirements against the contention, among others, that it imposed unreasonable burdens on interstate commerce. *See id.* at 677. The court determined the burden on interstate

commerce — decreased sales of out-of-state products to the vendors' state assuming the vendors went out of business — to be slight and not clearly excessive in relation to the benefits to the city in adopting the ordinance, *i.e.*, "reduction in urban blight, the potential development of vacant lots with permanent structures, and a heightened ability to police the vendors' operations." *Id.* at 679.

In short, a city may not, broadly speaking, unreasonably discriminate against persons, infringe on personal fundamental rights, or interfere with interstate commerce when regulating street vending.

## S U M M A R Y

A Type A general-law city may not prohibit the occupation or business of street vending, but it may, in general, prohibit or reasonably regulate by ordinance the sale of merchandise on its city streets, sidewalks, and other public places. It may also require by ordinance that a vendor obtain a permit as a condition to selling merchandise in the city and charge a reasonable fee. The city may regulate but not prohibit street vendors from going on private residences to sell their goods. If the state has authorized or licensed a particular occupation or activity that is the subject of street vending, a city might be precluded from requiring a permit as a condition of engaging in that activity within the city. Issuance of a sales tax permit to a vendor, however, is not such state authorization or license as to preclude the city from requiring a city permit. An ordinance regulating street vending may not, broadly speaking, unreasonably discriminate against persons subject to the ordinance, infringe on personal fundamental rights, or interfere with interstate commerce.

Yours very truly,

JOHN CORNYN
Attorney General of Texas

ANDY TAYLOR
First Assistant Attorney General

CLARK KENT ERVIN
Deputy Attorney General - General Counsel

ELIZABETH ROBINSON
Chair, Opinion Committee

James E. Tourtelott
Assistant Attorney General - Opinion Committee